**FILED**

SEP 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLEMMONS' ESTATE<br>c/o SAMUEL CLEMMONS<br>2137 SOFT PINE LN<br>ACWORTH, GA 30132<br>PH: 866-409-7758<br><br>    PLAINTIFF<br>vs.<br><br>STATE OF GEORGIA, et al<br>    ➤ **OFFICE OF SOLICITOR**<br>       **ATTORNEY RUPAL VAISHNAV**<br>120 N. Trinity Place, Decatur, Georgia 30032<br>    ➤ **ATLANTA FULTON COUNTY**<br>       **SHERIFF DEPT.**<br>901 Rice Street, Atlanta, Georgia 30318<br>    ➤ **DEKALB COUNTY SHERIFF**<br>       **DEPT.**<br>4425 Memorial Drive, Decatur, Georgia 30032<br>    ➤ **ATLANTA POLICE DEPT.**<br>Atlanta's Hartsfield International Airport at<br>4341 International Parkway, Atlanta, GA<br>30354<br>    DEFENDANTS | **CIVIL ACTION NO:**<br><br><br>CASE NUMBER  1:06CV01657<br><br>JUDGE: Royce C. Lamberth<br><br>DECK TYPE: Pro se General Civil<br><br>DATE STAMP: 09/26/2006<br><br>_JURY ACTION_ |

## PLAINTIFF FILE COMPLAINT AGAINST STATE OF GEORGIA FOR VIOLATIONS OF PERSON OR PERSONS RIGHTS UNDER THE STATE OF GEORGIA'S CONSTITUTION AND THE UNITED STATES OF AMERICA'S CONSTITUTION AGAINST CONTINIOUS CHARGES OF HARRASSMENT AND OTHERS CRIMES REPORTED, COMMITTED, AND FILED WRONGFUL AGAINST SUCH PERSON UNDER 111 ALR, FED.295 AND 18 U.S.C.A. § 1001. THE PLAINTIFF FILES THIS COMPLAINT FOR FULL CIVIL DAMAGES RECOVERY AGAINST SUCH STATE'S ACTIONS AS STATED IN COMPLAINT.

Comes Samuel Clemmons, Plaintiff *Pro Se* files this **REQUEST** to enter this complaint before this honorable court and judge due to illegal and lack of truthful legal service requested and surrendered in the State of Georgia where these crimes supposedly have taken placed. The Plaintiff seeks true but fair justice in this court of law requesting change of venue.

The Plaintiff file this request in this court to hear this complaint in it's entirely and honor such relief sought through change of venue so that the proper ruling according to the constitution can be administered according to the law.

This complaint is file in this honorable court against the State of Georgia and three state agencies that operate off state and federal funds in such state. All four agencies are:

(1) The Atlanta Fulton County Sheriff Department located @ 901 Rice Street, Atlanta, Georgia 30318, (2) The Dekalb County Sheriff Department which is located @ 4425 Memorial Drive, Decatur, Georgia 30032, and (3) the Office of the Solicitor office, Attn: Attorney Rupal Vaishnav which is located @ 120 N. Trinity Place, Decatur, Georgia which is connected to the Dekalb County Sheriff Department and last (4) the Atlanta Police Department located @ Atlanta's Hartsfield International Airport at 4341 International Parkway, Atlanta, GA 30354.

All four agencies are responsible for committing illegal acts or activities off government funds that are leading to corruption in our local and state government according to the constitution of the United States of America. By their wrongdoing and wrongful actions they are transferring corrupt materials, facts and evidence over to over into the federal government sectors by giving and providing false information administrated by those local and state agencies that are not true, accurate and correct according to the United States of America's Constitution see § 111 ALR, Fed. 295 which states, giving false information to Federal Departments, Agency

or court is a Violation of 18 U.S.C.A § 1001.  These are serious concerns and violation of the law.

As stated in the pervious paragraphs the agencies that which this complaint should target to be in violation are:

The Atlanta Georgia Fulton County Sheriff Department, Atlanta Police Department, and The Dekalb County Georgia Sheriff Department and the Dekalb County Solicitor's Office for placing such wrongful orders demanding and requesting such local agencies to step outside the fine line of the laws or jurisdictions to perform such illegal activities.  All four agencies should fully bear the cost, expenses and damages in this lawsuit for not following the proper criminal or civil procedures according to the law and the constitution of the United States of America.

In this complaint as the court will see that someone is fully responsible for these wrongfully violations of the constitution conducted by all four agencies. The Plaintiff who was once was the Defendant should not be the one to suffer or be mistreated due to these agencies or someone else wrongful interpretation of the laws and ethics. The courts will see that there is  no where in these actions performed by these agencies it will show or reveal the Plaintiff ever did anything wrong or to be in violation of any law or being or becoming insubordinate at any given time during these wrongful processes and administration of the law.

Therefore, the Plaintiff files his plea in abatement in this court against such illegal activity of the State of Georgia and the State of Georgia's employees whom should be fully but equally covered underneath State Insurance Professional Liabilities policies to be protected concerning the illegal search and seized into the Plaintiff's personal and private life without any proper documentation to support the State of Georgia's actions.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

Before the Plaintiff expresses his claim to this court the Plaintiff would add this concept in which I (the Plaintiff) would like this complaint and crimes to be used an interpret according the constitution of the United States of America and according to the true concepts of Criminology (See Attached Appendix I [1]). According to my studies and understanding of the laws, the constitution of the United States of America Criminology is suppose to be a scientific approach to study of criminal behavior . If we go back into time and research the theories of Edwin Sutherland and Donald Cressey who are known according to the laws as two prominent in revealing a much classic definition for this case, study and interpreting of these crimes presented to the court in this complaint it will layout the foundation according to the facts as to who is really the criminal with a born but not made agenda to commit crimes in this society in which we live.

*Criminology is the body of knowledge regarding crime as a social phenomenon. It includes within its scope the process of making laws, of breaking laws, and of reacting toward the breaking of laws.... The objective of criminology is the development of a body of general and verified principles and of other types of knowledge regarding this process of law, crime, and treatment.* [2]

In my study I find, Sutherland and Cressey's definition includes the most important areas of interest to criminologist: the development of criminal law and its use to define crime, the cause of law violations, and the methods used to control criminal behavior. Also important is their use of the term *verified principles* to signify the use of the scientific method in criminology.

---

[1]  **Appendix I**, Facts material on Criminology, Entitled Chapter 6, <u>Biological and Psychological Theories of Crime Causation</u>, p. 146 - 183

[2] Larry J. Siegel, "Criminology", p.4

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

It is known and said throughout my studies that many people study crimes without using established methods of scientific inquiry. These people are not criminologist but can be journalist, commentators, critics, social thinkers, and so on. Criminologist use scientifically verified methods to pose research question (*hypothese*), gather data, create theories, and test their validity. They use every method of established social science inquiry: analysis of existing records, experimental design, surveys, historical analysis, and so on.[3] It is this rigid adherence to the scientific method that sets the professional criminologist apart from the layman interested in the study of these particular crimes presented in this complaint or any other particular crime that one can gather a reasoning and understanding of one motive or commitment toward committing such crimes.

The punishment for a crime such as this one must be justified by the harm done. In order for someone to examine one element of a crime, they must examine the whole element including the biological factors which lead up to causing such crime to be committed. Now with the Defendants being in compliance with this court's instructions the Defendant must justify the harm done and to defend their actions or conducts to eliminate themselves from the criminal minded scenario and the civil damages that they are responsible for committing.

With the above paragraphs expressed and stated for the record I move to express the complaint in more detail.

On November 27, 2001, the Department of Justice contacts the Plaintiff to express during a background investigation the Plaintiff's identity had been stolen and a convicted felon had been using it potentially placing the Plaintiff and the Plaintiff's family in danger. Now one come to think, it's amazing, four months later, more serious problems and concerns started to surface

---

[3] Ibid., p.5

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

concerning identity theft, theft by deception and identity fraud which seem to develop into more

conspiracy crimes against the Plaintiff. The State of Georgia should be held responsible for

these crimes in which the Plaintiff are about to disclosure to the Court because it appears that all

crimes committed against the Plaintiff has happen in the State of Georgia in which this court can

see from pervious cases that maybe connected to this case.

On March 22, 2002, The Atlanta Georgia Fulton County Sheriff Department steps outside

its jurisdiction to come to a resident of the Plaintiff located at 5675 Roswell Road, Atlanta, GA

at approximately 2:30 a.m. without any proper documentation revealing the Plaintiff true

identity. Due to pervious episode of identity theft and identity fraud issues or concerns that is

now confirmed and verified in the United States District Courts as truthful, the Plaintiff refuses

to give out any personal information without proper documentation. The arresting officers failed

to announce who or what they wanted and what type of business they were there to perform. The

arresting officers by the names of **Deputy Wilcox** and **Deputy FSCO** both badges ID are

unknown according to the arrest records abruptly knocked on the resident as if it was an

emergency had existed. The Plaintiff thinking it was a family's emergency since the Plaintiff's

Daughter birthday was just on March 21st. The Plaintiff answered the door from his sleep and

asked the officers how he can help them? The arresting officers said nothing but ask the Plaintiff

who are you? The Plaintiff thinking that maybe the officers had the wrong apartment and went to

closed the door when the arresting officers abruptly push the door in, rushing the Plaintiff with

FORCE and handcuffing the Plaintiff without any further questions asked that is the 1st violation

of the Plaintiff's constitutional rights.

The Plaintiff was then placed in a squad car and taking and booked into the Fulton

County jail system on this date without any explanation to the Plaintiff for the reasons for such

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS
VIOLATIONS

arrest. Sheriff Deputy by the name of **SGT Ruffin** revealed the Plaintiff had no pervious or prior criminal records fingerprinted the Plaintiff at this point stealing the Plaintiff's identity through fingerprints. This is the 2nd violation of the Plaintiff's constitutional rights. The Plaintiff was assigned a booking number for the record of being **020885** without a police report attached.

The Plaintiff was advised that he will be transported from Fulton County to Dekalb County for further processing without the Plaintiff being aware of or had any knowledge to these events as to what was going on and why was he being detained and arrested in such a manner. The Plaintiff's Miranda Rights were not read during any of these processing or transporting nor was a copy a police report given to the Plaintiff for acknowledgment of a crime committed. This is the 3rd violation of the Plaintiff's constitutional rights.

On March 22, 2002 @ approximately 1:00 p.m., the Dekalb County Sheriff County shows up at Fulton County Sheriff Department to pick up the Plaintiff as if he was wanted for several serious crimes and handcuffed and shackled the Plaintiff as if he was a fugitive of the law. The Plaintiff expressed and pleaded the 5th Amendment and requested to speak to an Attorney concerning some false charges which were later turned around and label as Abandonment by fraud. The Plaintiff was booked and his fingerprints were sent over once again to the Georgia Bureau of Investigation which showed no pervious or priors arrested and this is where the Dekalb County Sheriff Department stole the Plaintiff's identity and falsely reported it to the Federal Bureau of Investigation and the Georgia Bureau of Investigation. Committing an agency crime according to the laws under § 111 ALR, Fed. 295 which states, giving false information to Federal Departments, Agency or court is a Violation of 18 U.S.C.A § 1001. This is the 4th violation of the Plaintiff's constitutional rights.

Within 48 hours after the Plaintiff was illegally arrested the Plaintiff was out on bond through a bond company by the name of <u>Speedy Bonding Company located @ 4329-F Memorial Drive, Decatur, Georgia 30032</u> (This information will be provided to the court at the Plaintiff's Motion Request to Enter Discovery. As of this date this complaint is filed in this court the Plaintiff is still under this bonding company, meaning the Plaintiff is still out on bond and still has not been tried for a crime or the crimes the Plaintiff has been accused. After this episode, the Plaintiff immediately went to retain an attorney by the name of Venice Daley. The Plaintiff informed Attorney Daley what happen and then entered his pleas of not guilty and requesting a jury trial into this matter of identity theft and identity fraud and clearly informed such Attorney of pervious matters as been advised by the Federal Government concerning problems with someone else having and using the Plaintiff's personal information whom is well known in the system as a convicted felon. This court is fully aware of such federal claims through pervious or other cases which this case maybe link to concerning these identity theft issues or problems which has lead to such false charges of Abandonment. Such charge against the Plaintiff still has not been proven in any court of law according to the constitution of the United States of America.

After informing Attorney Venice Daley of the conflicting matters or concerns, Attorney Venice Daley took the case and took the Plaintiff's funds and then went to research and reviewed the record by way of in camera inspections. Attorney Venice Daley in such record requested the state to seal the record revealing not enough evidence to charge the Plaintiff of such a crime. The Plaintiff will submit proof of this activity at the Plaintiff's Motion Request to Entered Discovery.

On June 3, 2002, the Plaintiff and Attorney Venice Daley shows up at the required arraignment hearing and enters a pleas for the record of not guilty and requesting a jury trial. On

this date the court accepted such entry and entered it as apart of the record. The Judge by the name of Alvin Wong placed such entry on the court's calendar and set such trial date for July 25, 2003 at 9:00 a.m. clearly advising and informing the State Solicitor's officer to be ready for this case or false charge of Abandonment to be tried in this court of law. The Plaintiff will provide this court with proof from the court and the Plaintiff's attorney of such activity upon the Plaintiff's Motion request to Enter Discovery.

On July 25, 2003, the Plaintiff shows up for his set trial date according to the court's instructions. On this date the court refused to hold such trial or give the Plaintiff an honest and truthful trial according to the Plaintiff's constitutional rights, resulting in <u>violation # 5</u> of the Plaintiff's constitutional rights under the due process of law. On this date and this date alone this case should have been dismissed and the Plaintiff's record should have been strike clean from any charges to attempt to label the Plaintiff as a state criminal; therefore, eliminating this lawsuit before this court today against the State of Georgia for violation of the Plaintiff's constitutional rights and several episodes but sever harassment charges.

The Plaintiff never gave anyone consent to administrative these unlawful but illegal procedures of the law upon him. The Defendants (the Atlanta Fulton County Sheriff Dept, The Dekalb County Sheriff Department, The State's Solicitor Office and the State Court) they should be held responsible and liable for these violations and illegal activities. After the court review of the facts in this case they should be sanction to stay away from the Plaintiff and the Plaintiff's family and be compelled to remove the entire Plaintiff's personal information from their systems or databases due to their wrongdoing and lack of judgment in administering the law.

In addition to the pervious problems the Plaintiff have faced in connection to these false claims, On June 5th, 2006 the Plaintiff was continued harassed by the State of Georgia through

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

1  placing another illegal arrest warrant upon the Plaintiff stating and claiming a <u>failure to appear</u>

2  <u>warrant</u> which the Plaintiff has never seen resulting in the Plaintiff being arrested coming into

3  the country coming from a family vacation by way of Costa Rica. The Plaintiff was not arrested

4  trying to depart the country to support the State alibi actions of the Plaintiff as being a fleeing

5  fugitive. The Plaintiff was once again illegally arrested this time by a Federal Government

6  Agency claiming another false charge of Abandonment for a crime the Plaintiff had once

7  defended himself by entering a plea of not guilty and requested to be tried before a jury trial. If

8  these are the same pervious fraudulent charges applied once again against the Plaintiff and if

9  such arrest was for Abandonment then the **<u>Double Jeopardy</u>** rule should apply as of this date as

10  well as false arrests against the Defendants for their actions performed. If such charged is or was

11  later altered to <u>failure to appear</u> which make this Federal Government Agency to be fully

12  responsible for failure to obey and follow the federal statue when arresting a person on <u>failure to</u>

13  <u>appear</u> charges under **<u>Federal Rule 40</u>**. Please review such federal statue laws attached which

14  will be added to the record in the Plaintiff's Motion Request to Enter Discovery.  If such charges

15  are not altered then the Plaintiff states and expresses in this complaint before this court that such

16  entry plea on such charges will remain the same as pervious charged. The Plaintiff once again

17  plea not guilty requesting a jury trial resulting in the <u>double jeopardy</u> rule meaning the Plaintiff

18  has to be fully and fairly be released from such alleged false claims administrated against the

19  Plaintiff and no such charges which the State of Georgia wishes or wants to be applied or

20  administrated against the Plaintiff not to be ever proven in any court of law according to the

21  constitution of the United States of America.

22       The Plaintiff should be completely exempted, released, and awarded for the damages the

23  Plaintiff has suffer from these illegal activities by such persons and by such agencies responsible

for these negligence acts of the law. Once again these agencies or people should be compelled to never brother the Plaintiff ever again by means of harassment in relation to this case and pervious cases or problems filed in this court of law and other court where the Defendants may think they have jurisdiction rights to administrative unethical behavior of the law to intimidate, harassed and continues to violate the Plaintiff's constitutional rights.

The local law enforcement agency responsible for such actions as stated and reveal in the above paragraphs is the <u>Atlanta Fulton County Police Department located at the Atlanta Hartsfield Jackson International Airport, **Attn: Officer McGrath, S, APD ID No. 3381**, 4341 International Parkway, Atlanta, GA 30354</u>. The Atlanta Police Department is also responsible for the mysterious missing of items and funds missing from the Plaintiff's personal carry-on bags. These items were left in their procession during the period the Plaintiff was wrongfully, but willfully with malice was detained. This proof will be provided to the court upon the Plaintiff's motion requests to Enter Discovery after the Defendants have responded to this complaint.

In continuous, after the Plaintiff was arrested on June 5, 2006, the Plaintiff was illegally detained by the State of Georgia for <u>14 days</u> without going before a judge to enter a plea for the charge or charges the Plaintiff was arrested for. This is <u>violation # 6</u> of the Plaintiff's constitutional rights when such laws require the Plaintiff to appear before a judge within 24 to 48 hours on all misdemeanor charges and 48 to 72 hours on all felony charges. By the State of Georgia refusing to honor the constitution this is viewed as serious but continuous harassment after many other episodes of harassment.

During this time period while the Plaintiff was detained in the Dekalb County jail facility a correction officer from the Dekalb County jail facility clearly advised and informed the Plaintiff before others. That he was detained for such period of time due to the Plaintiff charges

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

had been upgraded form a misdemeanor to a felony which will later be revealed and turned out to be a false statement by the correction officer and abuse of authority by the State of Georgia and the Dekalb County Sheriff Department. Thereby resulting in continuous harassment by the State of Georgia adding more damage recovery in this lawsuit before the court; the Plaintiff seeks damage recovery for giving and providing false information to someone who was illegally detained and continuous harassed by a state using federal funds within the Dekalb County Jail and the State of Georgia's court system causing such agency to once again to be in violation of § 111 ALR, Fed. 295 which states, giving false information to Federal Departments, Agency or court is a Violation of 18 U.S.C.A § 1001 this agency had to at one time report a false arrest and charge to federal authorities. This is violation # 7 of the Plaintiff's constitutional rights. [4]

The Plaintiff add this was not the only time the Dekalb County Jail and the court system intentionally, willfully and deliberately detained the Plaintiff for a 14 days period of time to cause continuous harassments and manipulate the Plaintiff to conform and bend to their illegal demands resulting in continuous harassment by the State of Georgia. The Plaintiff will provide the court with detainment records by the Dekalb County Jail if needed in the Plaintiff's Motion to Enter Discovery.

The second occurrence of event took place on March 3, 2003 when the Plaintiff show up in court to explain that he show up for an non-consent blood testing and the State of Georgia fixed documents to pretend and state the Plaintiff failed to appear to set up a fraudulent claims or actions of contempt of court by the State of Georgia. Due to these illegal incidents the Plaintiff has served a total of 28 to 30 days of illegal time served in jail for these wrongful but illegal

---

[4] Plaintiff will provide signed witness statements to this occurrence of events which will be entered for record during the Plaintiff's Motion Request to Enter Discovery.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

activities by the State of Georgia which the Plaintiff adds in this complaint as well for damage recovery. The Plaintiff has showed up on time for every court notice or action concerning these illegal activities.

## PLAINTIFF'S SUBPOENA DUCES TECUM REQUEST:

The Plaintiff would like to add in this complaint the Plaintiff's requests for the complete record through Subpoena Duces Tecum requesting the State of Georgia or its law enforcement agencies to release the complete record of showing any mail attempts to reach the Plaintiff concerning these false charges. Produce to the Plaintiff copies of mail being returned to senders, produce copies of all arrest warrants and search warrants, produces witness statements to their facts. The Dekalb County Sheriff and the Fulton County Sheriff should release to the court the Plaintiff's booking records showing the court the history in the numbers of time the Plaintiff's has entered its facilities showing the number of time the Plaintiff was booked, detained and the amount or number of days detained during each occurrence. Both Sheriff agencies should release to the court all the police reports after making such arrest to make such arrest valid and acceptable according to the laws and the constitution of the United States of America.

With the Plaintiff's Motion Request to Subpoena Duces Tecum in a civil case in place the Plaintiff now wishes to file this Motion to Suppress in this complaint stating that in this styled case before this court and in support thereof respectfully showed the court as follows:

1.  The Plaintiff once was the Defendant in a wrongfully State court action was herein charged with a wrongfully crime or offense of Abandonment which resulted in a fraudulent charged.

2.  The Plaintiff once was the Defendant show that on or about March 22, 2003, he was illegally arrested and charged with the above-stated offense in violation of O.C.G.A §

17-4-20 in that no crime was committed in the presence of any arresting officers. The arresting officers did not have an arrest warrant or search warrant; nor did the arresting officer produce such warrant at the time of the arrest; and this Plaintiff once was the Defendant was not endeavoring to escape. The arresting officer listed in the Plaintiff's documentation of proof that should and will be held accountability for these wrongful activities are: <u>Officer Wilcox, Officer FCSO and Officer or SGT Ruffin</u> from the Atlanta / Fulton County Sheriff Department. <u>Officer Moore, Badge # 1955, Jones and Robbins, Badge # 1993-2450</u> from the Dekalb County Sheriff Department as well as the Dekalb County <u>Sheriff Thomas Brown</u> who should be held accountable for the overall actions of all unethical and wrongful activities of Dekalb County.

3. That prior to said illegal arrest, the Police searched this Plaintiff once was the Defendant and retrieved no money without any identification to confirm who the arresting officer was arresting and without a search warrant to deprive beyond any scope to verify identity.

4. This Plaintiff once was the Defendant anticipates that said illegally seized of blood and fingerprints will be offered as evidence against him at his trial on said charge.

5. The Plaintiff once was the Defendant shows that the aforesaid illegal search and seizure was conducted unlawfully and in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States of America, and of the State of Georgia Article I, Section I, Paragraph XIII of the Constitution of the State of Georgia of 1983, in that said acts on the part of the arresting police officers constituted an unreasonable search and seizure in violation of said provisions.

6. The Plaintiff once was the Defendant specifically shows that such said illegal search and seizure was conducted prior to his being arrested and after being arrested and charged with any criminal acts.

7. The Plaintiff once was the Defendant further states that he is an aggrieved person by virtue of this unlawful search and seizure, and by virtue of the charge pending against him which arose out of the aforementioned unlawful search and seizure against his will and without his consent, all in violation of his rights under the laws of the State of Georgia, O.C.G.A. § § 17-5-1 et seq., and in further violation of the Fourth and Fourteenth Amendments of the United States of America Constitution.

WHEREFORE, this Plaintiff once was the Defendant prays in this civil lawsuit before this court and before the State of Georgia's Governor' Office. Report these wrongful activities within the State of Georgia and to request for full pardon of these wrongful charges and for violation of the Plaintiff's constitutional rights:

(a) That this court inquire into these matters and issue its order suppressing any and all evidence seized as a result of the said illegal search and seizure and rule the same inadmissible upon any trial of the charge set out in the State's charges captioned herein;

(b) That an order issue precluding the Prosecuting Attorney, any and all of his Assistant, and any and all State's witnesses from testifying to the subject matter of this illegal search and seizure, as the same constitutes the "fruit of the poisonous tree";

(c) The Rule Nisi issue directed to the Prosecuting Attorney of the State Court of Georgia, requiring him to show cause on a day certain why the prayers of this Plaintiff who once was the Defendant should not be granted.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

(d) This honorable court will see that the Plaintiff who once was the Defendant of the State of Georgia did nothing wrong and conducted himself accordingly according to the law. It was the State of Georgia who wrongfully, willfully, deliberately with malice intent to violate the Plaintiff's rights and the constitution law. Therefore, the Plaintiff should be set free with a clean record and never should be harassed by the State of Georgia ever again concerning this or these fraudulent matters of Abandonment or any other crimes which the state has tried to accused the Plaintiff of committing.

## I. PLAINTIFF FILE THIS COMPLAINT BEHIND THE THEORIES OF CEASARE LOMBROSO AND CRIMINAL MAN AND THEORIES OF HEREDITY OF HUMAN MINDS:

Now the Plaintiff comes and files this complaint behind the theories and mind of Ceasare Lombroso and the criminal man and theories of heredity of human mind to dissect who is really the criminal and who is not the criminal? The Plaintiff expresses to the court from his education, studies and understanding of the law and its concepts, it was discovered from reading and understanding the work of Ceasare Lomroso when such statement was made coming from Ceasare Lomroso stating that *"for every equal action there is an opposite but equal reaction"*. Meaning no matter what one may do to a person that is wrong and if that person is knowledge and educated to know what such person has done was wrong and can express, explain and prove that such action performed by such person in the society that we live was wrong then the injury person can reflex back with an action that can be just as opposite for recovery from such wrongdoing by such violator(s) and develop an instrument such as a complaint against such violators for full recovery of damage due to violation of persons rights and constitution rights

violations as what the Plaintiff is doing today against the parties who are involved and committed these acts of wrongdoing and wrongful interpreting and administration of the law.

To support the Plaintiff's theories and the concepts of this complaint the Plaintiff will attached Appendix I which is a detail chapter entitled Chapter 6, Biological and Psychological Theories of Crime Causation[5] which should eliminate unnecessary arguments or attempts to cover-up any wrongdoing and for one to become more educated into thinking who is the true and real criminal when this is lawsuit is completely heard in any court of law.

In support of chapter 6 attached, I (the Plaintiff) do come to mind into thinking that a non criminal minded person can place him or herself in danger at any given time when approaching and trying to assist and help a known criminal minded person or a person who just don't understand the values and concepts of life. These criminal minded persons who minds are not stable into truly knowing what exactly what they are doing and some that knows exactly what they are doing, but ignorance of the law is no excuse for anyone. These criminal minded persons will only do such wrongdoing in an attempt of element to make such non criminal minded persons into a criminal so that the non criminal minded person will not be viewed as any difference from them in the society in which we live.

## II.  CRIMINAL MINDED VS. NON CRIMINAL MINDED PERSONS OR PEOPLE:

Criminal minded persons wants so badly to get something on someone so that the criminal minded system or society that such criminal minded person live or work in can control the non criminal minded person under the same treatment of laws such criminal minded person live and function under. Therefore, the criminal minded persons or people create crimes of malice, intent and deliberately setups crimes of deceit (FRAUD) in corrupting a norm but perfect society in

[5] Ibid, p. 146 - 183

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS
VIOLATIONS

which we live. Remember a criminal minded person can't accept the truth. A criminal minded person can't accept the facts when they are wrong or have done wrong. A criminal minded person is always in fear of the true justice system. A criminal minded person hate to admit or accept any facts that reveal they possess such traits or chromosome into becoming a criminal or behave as a criminal even when someone can see the signs and symptoms. They even hate to admit that patterns of crimes plague apart of their family or families to arrive to the facts that criminals are born and are not made. A criminal minded person(s) can always have the influence on a person to trigger or convince one into committing or assistance in committing criminal acts. Activities or life function of events, occurrences and criminal record set such pattern of studies into person possibilities. These are the factors we should be using in this country to conduct more accurate, safe and secure background check and background investigation to determine who is safe under certain security information and who is really protecting the non criminal minded so that they can continue to perform and protect the true society in which we live. We should be striving to produce a non criminal minded society according to the United States Constitution not a criminal minded constitution.

## III.  CRIMES WITNESSED BY THE PLANTIFF AFTER BEING INCARCERATED BY THE DEFENDANTS: THEY ARE:

### 1)  True Crimes of embezzlement by the Dekalb County Sheriff Department.

On several occasions where the Plaintiff was wrongfully arrested for a crime the Plaintiff has no responsibility for committing or did not commit. The Plaintiff expresses to this court and other courts that such Defendant (The Dekalb County Sheriff Department) has committed multi but many crimes of wrongful arresting people within its county of jurisdiction and outside of its jurisdiction and intentionally holding them well beyond the

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

required amount of time for holding someone under a misdemeanor or a felony charge.

The reasons for these wrongful but intentional holds are to draw more funds from the state

and federal level agencies in illegal reporting head counts of those who should have been

released to return back to society to work and care for their immediate families. Resulting

in such person being intentionally held to lose incomes, jobs, etc. to cause further hardship

to force such person or people into more criminal minded activities or behaviors to commit

more crimes to have them once again processed through their systems of detainment to

keep the amount of funds received by the state and federal government coming in on a

continuous basis. The more days each person who is wrongfully held beyond the standard

procedures of the law is to accumulate more funds into their illegal systems to generate

more pay increases, promotion to those who are intentional responsible for committing

these illegal act or activities.  I (the Plaintiff) can personally say and witness that from my

observation into this criminal minded facility I truthful witnessed such person as myself

and others who were wrongfully held well over the amount of time required by law. I (the

Plaintiff) fully witness seeing that staff or employees of this outfit clocking in and

performing four hours on the clock working and the remaining 4 to 5 hours on the clock

not working or simply playing around and wasting taxpayers dollars when they should

have been working to get those people processed and released within a set time to appear

before a judge to enter their pleas to the crimes or charges they were brought in to be held

against them. I say to the court and to the Defendants these types of actions should not hold

any excuses when such business is suppose to be conducted according to the constitutional

of the United States of America. What we have here in this section of this complaint is a

criminal minded organization committing criminal minded activity within out judicial

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS
VIOLATIONS

system to get rich or richer off taxpayers dollars and to pray on those who are less fortunate to know their rights (IQ Factor) according to the constitutional of the United States of America.

### 2) True Crimes of Identity theft, theft by deception and Identity Fraud.

The State of Georgia is responsible for stealing many persons or people identity and personal information and using it against such person before formally charging a person of a crime or convicting such person in a court of law after such person has plead not guilty and requesting a full trial before his or her peers according to such person(s) constitutional rights. I (the Plaintiff) have witness that a certain group of persons or people are label as guilty upon the initial period of arresting such a person and such person is not innocent until proven guilty. They are guilty until proven innocent which is not according to the laws of the United States of America Constitution which make these law breakers or violators within our judicial system unethical and without characters which make them criminal minded into bending, altering and wrongful interpreting the laws to work only in their favor and not according to the Due Process of Law in which they wish to alter and control.  Therefore, making such state as the State of Georgia to operate and administrate such laws unconstitutional creating such state into a communist rule society as an illegal outfit or without part of the United States of America Constitution.

### 3) A True Story to fit the Plaintiff's Reporting of Crimes by these agencies.

    a) On June 12, 2006, an inmate from the Dekalb County Correctional Facility finally went to his guaranteed pre-trial hearing. This inmate had been housed underneath local, state and federal funds for approximately <u>25 days</u> before ever or been granted his constitutional

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

pre-trial rights. The inmate was booked and charged with a

misdemeanor crime of urination in some brushes where he was not

legally exposed to the public.  The inmate was charged with a crime

and book and processed into the Dekalb County Correctional Facility

with a $10,000.00 cash <u>only</u> bond. As I (the Plaintiff) have always

question here. Who is the criminal or who have the criminal mind

instinct? Is this type of treatment or behavior is constitutional, correct

and within the scope and means of the United States Constitutional? I

think not and many others will think the same and should be

demanded after full review of this complaint in the courts for certain

people in the system to step down and for the courts and people in

true leadership positions to impose a sanction on these agencies in

their manner in doing and conducting business concerning the image

they portray of the State of Georgia.

The incident above happened and no one can deny that such incident did not

happen. It's all part of a record in this county and it's a part of this pervious or former

inmate personal injury for life. From my prior experience in this field, this person should

not have been arrested. The arresting officer should have fully understood the concepts of

when you have to go you have to go using the common sense theory.  This person who was

arrested as explained to me by many witnesses in this courtroom that such person was just

riding his bike to work and explaining to the court that such person had an urgent need to

use a restroom and sprinted to some conceal brushes to do his business. This arresting

officer who was at the time was patrolling and saw the person behind the brushes not in

plain view. The arresting officer pulled over his squad car and presumed what he had been

trained or instructed to do by his higher leadership within the Dekalb County Correctional

or Jail Facility to arrest first and ask questions later.  The arresting officer arrested the

person causing intentional hurt and harm to such person and to such person family,

business, etc. in an malice intent by the Dekalb County to intentional cause such damage to

turn such person into a Dekalb County's criminal minded or behavioral minded person

with the intentional and purpose intent to embezzle more funds from the state and federal

government in reporting false claims for more funds to care for and housed people such as

myself and this Hispanic person.  Remember on <u>June 12, 2006</u>, I was still illegally detained

and housed in this jail facility. I was not in court on the same date to personally witness this

event or incident. One should wonder how was I able to get the news or story that such

incident happen and know it is apart of the Dekalb County records of wrongdoing.

When reviewing the scenario of this so call crime incident, I say this person should

have been given a citation and a date to appear in court to response to whatever this

arresting officer was trying to charge such person with at this time. This truly shows and

reveals the level of competence in this organization or county who is suppose to be

honoring the system of justice and not creating a criminal enterprise.

This incident was told and explained to the same judge (Judge Edward Carrier)

who is also responsible for signing a fraudulent bench warrant against me for an

outrageous claim of <u>failure to appear</u> in connection to other fraudulent activities

administrated by other wrongdoers within the agencies who are subjects in this lawsuit.

This incident and these incidents alone should suffice and support other allegations in

connection to this complaint of dealing with criminal minded people in this district of

government.

   4)  **Second true Story of illegal activity by Dekalb County Government:**

   a)  **In the year of 2006, Dekalb County CEO Vernon Jones should have been**
       **arrested and charged with RAPE charges when a female within the Dekalb**
       **County District comes forth with a allegation or claim against the CEO**
       **expressing and stating that she had been RAPE and ASSAULTED by the**
       **CEO. Still until this date, this CEO did not spend not one day or night in jail**
       **nor did such person was ever brought before a judge to answer or response**
       **to such serious crimes made publicly over the television stations, radio and**
       **newspaper stands. Is this fair or is this justice according to my claim or**
       **fraudulent charges being filed or tried to be administrated against me and**
       **others? Regardless of one position, it does not make such person to be above**
       **and beyond the law. I questioned and I know thousands of other may**
       **questioned the same...Why wasn't he treated the same like everyone else**
       **who are brought into our judicial system on allegations or plain view on false**
       **charges. Why wasn't the CEO handled in the same matter of guilty until**
       **proven innocent in that the Dekalb County Government seems to operate**
       **on? Why wasn't the female perpetrator brought in on false charges or filing**
       **a false complaint? This county of government should be enforcing the slogan**
       **of *"Lead by Example not Example lead before Leadership"***

   **These two stories as expressed above should show and tell that my (the Plaintiff)**
**claims before any court concerning these matters that I have been confronted with in the**

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS
VIOLATIONS

**courts that these agencies within the State of Georgia should show and fully justify their actions were appropriate and proper. Therefore, this case should have great merits and should be administrated according to the laws of United States of America's Constitution.**

In order to determine who the criminals are in these wrongdoings, the Plaintiff is requesting this case to be heard before a jury (jury trial) for all the facts and probable causes to be brought forth for a jury to hear and rule according to the laws of the United State of America's Constitution.

The Plaintiff expresses to the court, the Plaintiff did not ask to be brought here or request to place himself in this court of law. It was the Defendants based on their actions brought the Plaintiff here and if the Defendants' actions are not justified then the Plaintiff seeks full relief through the recovery he seeks in the punitive damage recovery as stated in this complaint.

Therefore, the Plaintiff moves forth and files this civil lawsuit in the United States District Court for the District of Columbia in seeking full relief from the sequences of events which lead to this illegal arrest, detainment, identity theft, theft by deception, identity fraud and many more constitution rights violations. Resulting in various forms of harassment by the State of Georgia causing the Plaintiff undue pain and suffering, emotional distress, anxiety disorders, lost of income and jobs due to these wrongful actions by its local and state employees who have caused and committed crimes which are now in violation of the articles of federal laws of section111 ALR, Fed. 295 and 18 U.S.C.A § 1001. The Plaintiff is requesting recovery for damage in the amount of **$ 60,000,000.00** (sixty million dollars) after taxes for full recovery and reporting this or these crimes to the court to administrate and request order in conducting legal business according to our United States of America's Constitution. The Plaintiff is requesting through the court for the courts to order the State of Georgia to change its practice and ways in

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

honoring the constitution and administrating the laws of justice. Order the government to make an amendment to such laws that specific target a certain sector of people. Especially the gender of men when the majority of its cases are the opposite sex of females who have performed an intentionally, willfully, deliberately act with intent of malice and intent to harm, hurt and set up the male for monetary gain only. But the majority of it cases places an innocent soul or life to be without just for the female or female's actions of wanting something and not knowing how to fully provide and care for what they are willing to setup a male to have for monetary reason only. Majority of these cases is from people who are low-income families. These persons or people are trying to find ways or mean to suffice additional income for their own selfish gain and not according to the constitution laws of marriage with an intentional intention act to strive and work to become a productive citizen of this county. Therefore, showing a meaning to proper care and educate another human being according to the norms in which this society suppose to be build on. If we examine this segment of these motives of crimes we have criminal minded people creating deceit and having with intent to breed or born other criminal minded to keep the flow criminal activity going. Therefore the laws of Abandonment concerning children should only apply to those who have taken the vow toward true matrimony and not toward those who have not appeared before a court or any other legal witness to represent a true marriage or togetherness. This should help the state and not continue to hurt the state through the crimes that does exist or cumulated from these illegal actions or activities in this state. Abandonment should be base on the facts of <u>knowing</u> with an <u>intentional act</u> of neglecting "<u>leaving without</u>" There is no where in the record of the State of Georgia where the State can prove beyond a reasonable doubt that such elements fit the actions or give merit to those for violation of the constitution and what they (all four agencies) have tried to apply or administrated upon the Plaintiff.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

The Plaintiff is requesting complete relief from this court. The Plaintiff is requesting the court to request all documentation from the pervious courts ordering all law enforcement agencies that have wrongful but illegal filed anything listing the Plaintiff as a convicted criminal in a court of law. They should be order to compel and completely remove the entire Plaintiff's personal information from its databases and to turn over all documentation to support their rebuttal or defense within such time frame of 20 to 30 days as so instructed by this court of law. Due to expressed facts or witnesses by the court that these agencies and personnel listed in this lawsuit are truly in violation of section 111 ALR, Fed. 295 and 18 U.S.C.A. § 1001.

By continued employment of these agencies and personnel of The State of Georgia; the State of Georgia is fully responsible for causing more crimes according to the law to be committed due to their wrongdoing and incompetence actions according to the laws. Therefore, the State of Georgia laws are not in compliance at all and are not in accordance with the constitutional laws of the United States of America.

The Plaintiff wishes to reserve his rights to maintain and sell this complaint and story to the public if necessary.

## IV. PLAINTIFF'S INITIAL SUBPOENA DUCES TECUM REQUEST:

If the State of Georgia can provide this honorable court with legit documentation of an arrest warrants attached with a search warrants. Consent forms signed by the Plaintiff consenting to perform any activity on the Plaintiff's private or personal parts. Documents from the State's Solicitor Office showing mail being returned prior to such wrongful arrests. Documents from the State's witness showing notices sent but were returned stamped return to sender showing effort or attempt to notify as so claim by the State of Georgia. Provide documents of evidence showing joints or join between two individuals to validate the element of the law of intent to neglect.

Provide documentation of proof before and after this unlawful arrest along with documents showing the Plaintiff's signature consenting to perform an illegal search and seizure of tangible evidence. Provide this court with valid police reports expressing and confirming that a crime has been committed. The Plaintiff will drop this lawsuit for damage recovery but not the Plaintiff's request according to O.C.G.A. §§ 16-5-94 (e) and 19-13-4 (c).

In addition to the Plaintiff's Subpoena Duces Tecum requests as stated above and in earlier parts of this complaint, the Plaintiff wish to bring in a certified highly skill professional or professor of Criminology from a major local university within the District of Columbia to serve as an expert witness to the facts that will be presented in this court of law to professionally make an assessment before this court in reviewing all the documents submitted into this court as evidence so that the end assessment results will be reveal to this court, a jury and the public as to who is the real and truthful criminal minded persons from these activities performed resulting in this lawsuit in this court of law.

Experts should be brought in to testify to the validity of all testing so allegedly claim was conducted in connection with the Criminologist testimonies.

## V.  PLAINTIFF'S PARDON REQUEST TO THE STATE OF GEORGIA'S GOVERNOR OFFICE:

The Plaintiff still wishes and requests that all personal information be deleted from the States of Georgia records or database thereby releasing the Plaintiff due to the States faults, wrongdoing and technicalities and the Plaintiff still wishes to leave the State of Georgia with no intention of ever returning.  The Plaintiff did no wrong or committed no wrongdoing at all to cause this type of treatment brought upon the Plaintiff and to be administrated to the Plaintiff. Due to the State's initial rush to judgment the State of Georgia caused these actions upon itself.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

The Plaintiff does not and will not ever have the trust in the State of Georgia and its legal system to administrate the law according to our constitution.  The two Georgia cases of concerns are: **05C59102** and **02C25757** both are FRAUD, illegally but wrongfully labels the Plaintiff as a State Criminal with a criminal mind set according to their interpretation of the laws (The State of Georgia).

The Plaintiff will provide the State of Georgia's Governor Office, Attn: Pardon Division the Debit card once provided to the State Court of Georgia and the State of Georgia's allegedly claim "compete" claimed witness to this or these crimes. This card will have a face value changed from $15,000.00 to $11,000.00 (*deducting the cost of attorney fees paid for no service render*). This amount should be donated to any charity organization in the State of Georgia to so claim assist and help aid in prevention of certain matters such as this one from ever taken place in such state ever again.  From the award of this lawsuit this suit will close out and pay out any debt the State of Georgia may have thought or claim the Plaintiff may have owe the State of Georgia.

The Plaintiff will confirmed facts and proof of paying a total of **$ 4,000.00 +** in legal fees for justice the Plaintiff has as not yet received after pleading not guilty and requesting to be tried among his peers to stay within the constitution of the law. To this date, the Plaintiff has paid enough for justice to be performed according to the laws attached that the Plaintiff will provide to this court with evidence of the laws in the Plaintiff's Motion Request to Enter Discovery.

If the laws cannot be applied to the Plaintiff's case as described in this complaint then there is a double standard of the law which reflect discrimination and in violation of the Plaintiff's civil right and human rights according to United States of America's Constitution. Therefore, the best solution is for both the State of Georgia and the Plaintiff to stay away from

each other and for the State of Georgia to be fully responsible for all the damages in stepping

outside the line of the laws and the constitution.

In the end, someone has to lose and base on document requested to have subpoena for the

record. The record should fully reflect who win and who lose and who has the criminal mind to

commit such crimes as expressed and reveal in this complaint.

By the State of Georgia's action to use a bogus crimes such Abandonment, and other

methods of crimes that has been proven in this court of law coming out of the soil and from the

State of Georgia. The State of Georgia continues to show wrongful setups attempts to setup the

Plaintiff. In an effort to label, control and embarrass the Plaintiff in hope without knowing but

hoping that the Plaintiff will not know his rights and how to fight back or stand up for his

constitutional rights (See the IQ Factor section in the Appendix). The Plaintiff files this full

lawsuit before this court with merit and such lawsuit is not frivolous in expressing 100 % relief

from the criminals who will be brought to justice upon full review of the records. A crime is a

crime and those who choose to commit such crime or play apart in such a crime must pay for

such crime. The Plaintiff has not committed a crime nor can the Defendants prove or convince

this court that the Plaintiff committed a crime according to the proper procedures of the law as

stated and requested in this complaint.

## PLAINTIFF'S REQUESTED CASES TO CONSIDER UPON JUDGMENT:

Therefore, the Plaintiff wish to add, When considering a motion for summary judgment,

it is known that the court must examine all evidence in the light most favorable to the Plaintiff

(nonmoving party). The Plaintiff wishes for the court to consider case laws to support the

Plaintiff's complaints which are *Odum v. Smith*, No. CV98127449; *State v. Slavny*, 195 Ga. App.

818 (1990), 395 S.E. 2d 56 and Smith v. Ga. Department of Human Resources, 226 Ga.

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS
VIOLATIONS

App.491, 493 (1997), *Department of Human Resources v. Pinter*, 241 GA. App. 10; 525 S.E. 2nd 715 (1999) and other related cases showing an intent, with knowledge to neglect. They are:

*Biddle v. Commonwealth*, Supreme Court of Appeals of Virginia, 1965. 206 Va. 14, 141 S.E.2d 710; *Regina v. Hogan*, Court of Criminal Appeal, 1851. 5 Cox C.C. 255; *Regina v. Downes*, Court of Criminal Appeal, 1875, 13 Cox C.C. 111; *Jones v. United States*, United States Court of Appeal, District of Columbia Circuit, 1962, 113 U.S. App.D.C. 352, 308 F.2d 307. *The Queen v. White*, Court for Crown Cases Reserved, 1871. L.R. 1 C.C. 311; *Rex v. Russell*, Supreme Court of Victoria, 1932, [1933] Vict. L.R. 59.; *Moreland v. State*, Supreme Court of Georgia, 1927, 164 Ga. 467, 139 S.E. 77; *Commonwealth v. Putch*, County Court, Allegheny County, Pennsylvania, 1932, 18 Pa.D. & C. 680; *Van Buskirk v. State*, Court of Criminal Appeals of Oklahoma, 1980, 611 P.2d 271. As well as the Plaintiff truthful submission of information of reporting other crimes the Plaintiff has witness during these period of wrongful incarceration by the Defendant as stated by the Plaintiff in pervious section of this complaint which this complaint can set the grounds with other pervious complaint filed in this court by the Plaintiff that can trigger to similar case such as *Wright v. United States*, 519 F.2d 13 (7th Cir. 1975) and *Gebardi v. United States*, Supreme Court of the United States, 1932, 287 U.S. 112, 77 L.Ed. 206, 53 S. Ct. 35 which relates to conspiracy to commit two or more to combine to perpetrate such fraud acts or crimes of deceit such as these stated in this complaint.

In additional the Plaintiff would advise the Defendants to consider case laws *Langley v. Adams County*, Colorado, 987 F.2d 1473, 1476 (10th Cir.1933) when coming forth with an answer to this complaint against them and let it be well known when a moving party (the Defendant) bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P.56(c); See case law:

*Anthony v. United States*, 987 F.2d 670,672 (10th Cir.1993). If the moving party (the Defendant) does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's (the Plaintiff) case" In this case the nonmoving party (the Plaintiff) has expressed evidence to support the Plaintiff's claim; therefore, case law to consider: *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) holds no merit in this case matter. The State and Federal Insurance Company under Crime Insurance Policy No, provided by the Defendant (hereinafter the "State and Federal Policy", and therefore the Defendants have sustained no loss in this action, nor did the Plaintiff cause any hurt or harm to the defendants, the Defendants caused this action or judgment upon the State of Georgia. Therefore, the Plaintiff uses this paragraph to be use for summary judgment standard that it should not be any difference from those used in federal employee violation of the law. This state as well receives and operates off federal funds.

This complaint was prepared on the basics of Article 1 Bill of Rights, paragraph V, VI, VII, XI, XII, XIII, and XIV. The Plaintiff wishes that such Articles be applied in all ruling.

*"They say in the end ...Good will always triumph over Bad...."*

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

**End of Complaint Request:**

Pursuant to 28 U.S.C. Sec. 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing statements and Exhibits that will serve as evidence are true and correct for the record, I signed these statements before a certified legal notary witnessing me (the Plaintiff) signing to make any but all statements as truthful, legal and binding under oath making this submission and others statements, responses or submission are sworn Affidavit under oath this date forth for the record.

Respectfully Submitted,

Samuel Clemmons
Plaintiff, *Pro Se*

**Attachment:** Chapter 6, Biological and Psychological Theories of Crime Causation



Notary Witness Signature          8/30/06

                                  Date and Notary Seal

PHYLLIS BILLINGSLY
NOTARY PUBLIC
Paulding County
State of Georgia
My Comm. Expires Mar. 9, 2009

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

**<u>Express Mail Tracking Confirmation:</u>**

Georgia State Attorney General Office:

Express Mail Tracking #: <u>EQ 236 240 621 US</u>

Dekalb County Office of the Solicitor Office

Express Mail Tracking #: <u>EQ 236 240 604 US</u>

The State of Georgia Governor's Office:

Express Mail Tracking #:  <u>EQ 236 240 635 US</u>

Atlanta Fulton County Sheriff Department:

Express Mail Tracking #:  <u>EQ 236 240 578 US</u>

Dekalb County Sheriff Department:

Express Mail Tracking #:  <u>EQ 236 240 581 US</u>

Atlanta Fulton County Police Department:

Express Mail Tracking #:  <u>EQ 236 240 595 US</u>

United States District Court for the District of Columbia:

NA

United States Federal Court of Appeals:

Express Mail Tracking #:  <u>EQ 236 240 618 US</u>

<u>CLEMMONS' ESTATE v. STATE OF GEORGIA, et al</u> (REF: CONSTITUTIONAL RIGHTS
<u>VIOLATIONS</u>

# Appendix I

06 1657
FILED

SEP 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

PAGES: 143 - 184

# CRIMINOLOGY



# LARRY J. SIEGEL

(143)

# 6 Biological and Psychological Theories of Crime Causation



CH...

Intr...

Fou...
Cesa...
Lom...
The...
Bod...

Moc...
Bioc...
Neu...
Gen...
Eval...

KEY...

biocr...
psych...
Cesa...
atavi...
mora...
E.O...
socio...
ment...
psych...

## CHAPTER OUTLINE

### Introduction
### Foundations of Biocriminology
Cesare Lombroso and Criminal Man
Lombroso's Contemporaries
Theories of Heredity
Body-Build Theories
### Modern Biocriminology and Sociobiology
Biochemical Factors
Neurophysiological Studies
Genetic Influences
Evaluation of the Biological Perspective

### Psychological Theory of Crime
Early Psychological Theory
Psychoanalytic Perspective: Sigmund Freud
Post-Freudian Psychoanalytic Theory
Psychoanalysis and Criminal Behavior
Cognitive Theory
Behavior Theory and the Social Learning Approach
Psychobiological Perspective
Crime and Personality Traits
A Critique of Psychological Theories
### Individual-Oriented Theory and Social Policy
### Summary

## KEY TERMS

biocriminology
psychocriminology
Cesare Lombroso
atavistic anomaly
moral anomaly
E.O. Wilson
sociobiology
mental degenerate
psychoanalytic perspective

cognitive theory
social learning
behavior modeling
psychobiologist
Sigmund Freud
repression
fixated
Carl Jung
inferiority complex

identity crisis
schizophrenia
August Aichorn
social learning
Albert Bandura
sociopath
psychopath
classification center
medical model

145

**Introduction**    The preceding chapter explained how criminologists of the classical school maintain that criminals choose to violate the law after carefully weighing the benefits and consequences of their illegal activities. Not all criminologists are convinced, however, that this calculated thought process actually takes place. Since the middle of the nineteenth century, social scientists have suggested that uncontrollable environmental factors may significantly influence behavior patterns. Physical makeup, mental and psychological status, family structure, and socioeconomic conditions have all been viewed as contributing to behavior tendencies. As a group, social scientists who believe a person's behavior is controlled by outside forces and not his or her personal decision-making processes are referred to as *positivists.*

The earliest positivist theories of crime causation focused on the criminal's biological makeup and psychological makeup. Theories about the former suggest that criminals have unique biophysical properties that motivate their antisocial behavior **(biocriminology),** while theories about the latter are more concerned with the relationship to criminal behavior of psychological factors such as mental stability, intelligence, learning, and moral development **(psychocriminology).** Although biological and psychological theories were among the earliest criminological perspectives, their advocates are still quite active today.

In general, the pioneers of biocriminology and psychocriminology held that the classical approach was an inadequate explanation of crime, because it failed to explain why one person chooses to commit crime while others adhere to conventional values and beliefs. Positivists maintained that whereas most people living under similar conditions are subject to the same socialization process, only a small minority become seriously delinquent or criminal. Therefore, some personal trait must separate the deviant members of society from the nondeviant. These personal differences explain why, when faced with the same life situations, one person commits crime while another attends school, church, and neighborhood functions. All people may be aware of and even fear the sanctioning power of the law, but some are unable to control their urges and passions. These people commit crimes of violence and destruction.

As a rule, no single biological or psychological concept is thought to be adequate as an explanation of all criminality. Rather, as common sense would suggest, each offender is considered unique physically and mentally; consequently, there must be different explanations for their different behaviors. For example, one person may have had a very ordinary childhood and yet have "learned" to be violent through personal experiences in adolescence. Another offender may be suffering from a neurological problem, while a third may have a blood chemistry disorder believed to be related to antisocial activity. Criminologists who focus on the individual see many explanations for crime, since, in fact, there are many differences among criminal offenders.

Biocriminologists and psychocriminologists are not overly concerned with legal definitions of crime. Their studies focus on basic human behavior and drives—aggression, violence, lack of concern for others, depression, and so on.

This chapter will first review the history and current status of biocriminology. This perspective holds that criminals have in their physical makeup properties that make them crime prone. Then the chapter will turn to a discussion of psychological theory; such theories view crime as a product of personality, learning, and mental processes. In the following two chapters, sociological positivism will be discussed.

## Foundations of Biocriminology

Biological explanations of criminal behavior first became popular during the middle part of the eighteenth century. At that time, there was considerable ferment in the scientific community. A great deal of interest developed in *positivism*—the use of the scientific method and empirical analysis to study behavior. While classical penologists such as Beccaria and Bentham were trying to explain people's behavior through armchair analysis and logic, others attempted to apply the scientific method to the study of criminal behavior. One natural avenue of inquiry was the association between biophysical makeup and crime.

The earliest biocriminologists were concerned with the shape of the head and body. *Physiognomists* such as J. K. Lavater studied the facial features of criminals to determine whether the shape of ears, nose, and eyes and the distance between them were associated with antisocial behavior. *Phrenologists* such as Franz Joseph Gall and Johann K. Spurzheim studied the shape of the skull and bumps on the head to determine whether these physical attributes were linked to criminal behavior. Phrenologists believed that external cranial characteristics dictate which areas of the brain control physical activity. Their primitive techniques and quasi-scientific methods have been thoroughly discredited.

### CESARE LOMBROSO AND CRIMINAL MAN

With the publication of Charles Darwin's *Origin of Species* in 1859, the scientific quest to unlock the secrets of human origin and behavior received considerable momentum. In Italy, an Italian physician, **Cesare Lombroso,** was studying the cadavers of executed criminals in an effort to scientifically determine whether law violators were physically different from people of conventional values and behavior.

Lombroso (1835–1909), known as the "father of criminology," was a doctor who served much of his career in the Italian army. His army experience gave him ample opportunity to study the physical characteristics of soldiers convicted and executed for criminal offenses. Later, he studied inmates at institutes for the criminally insane at Pavia, Pesaro, and Reggio Emilia.[1]

Lombrosian theory can be outlined in a few simple statements.[2] First, Lombroso believed that serious offenders, those who engaged in repeated assault- or theft-related activities, were born to be criminals. These *crimogenic* people have inherited physical problems that impel them into a life of crime.

Second, said Lombroso, criminals suffer from **atavistic anomalies**—physically, they are throwbacks to more primitive times when people were savages. For example, criminals were believed to have the enormous jaws and strong canine teeth common to carnivores and savages who devour raw flesh. In addition, Lombroso compared criminals' behavior to that of the mentally ill and those suffering some forms of epilepsy.

According to Lombrosian theory, crimogenic traits can be acquired through *indirect heredity*, from a "degenerate family with frequent cases of insanity, deafness, syphilis, epilepsy, and alcoholism among its members." Direct heredity—being related to a family of criminals—is the second primary cause of crime. In addition to heredity, environmental conditions can promote crime—alcoholism, lack of education, temperature swings (hot temperatures were related to violent crime), and imitation of well-publicized crimes. Thus, while Lombroso believed that inherited biological factors are the primary cause of criminality, he also recognized that environment can affect antisocial behavior.



**Other Criminal Types.** In his later writings, Lombroso estimated that only one-third of law violators were born criminals. He identified several other antisocial types that round out the criminal universe. Of these, the most prominent is the *criminaloid*, who differs from the born criminal by a relative lack of atavistic traits. Criminaloids are drawn into crime by their greed and the desire for easy wealth and then become enmeshed in its clutches. They are the pickpockets, swindlers, con men, and smugglers that plague society. Though more intelligent and physically superior to born criminals, their contact with them in prison, coupled with a love of alcohol, causes criminaloids to develop into habitual criminals who cannot be distinguished from more serious types.

Lombroso also identified the *insane criminal*, an exaggerated born criminal who commits impulsive, obscene, and cruel acts. *Criminals by passion* are the opposite of the born criminal.[4] They are characterized by an excessive number of noble traits—integrity, sensibility, altruism, and affection. Passionate criminals may kill someone who has dishonored their family or has been unfaithful to them. In almost all cases, their crime is murder; and it is not uncommon for their suicide to follow that crime. Finally, *occasional criminals*, or *pseudo-criminals*, are those who do not seek to commit crimes but are drawn into doing so for insignificant reasons.

Lombroso's work is regarded today as historical curiosity, not scientific fact. His research methodology has been discredited. He did not use control groups from the general population to compare his results. Many of the traits he assumed to be inherited are not really genetically determined. Moreover, many of the biological features he identified could be caused by deprivation in surroundings and diet. That is, even if certain biological traits were related to crime, they might be products not of heredity but of some environmental condition such as poor nutrition or health care. Thus, it is conceivable that both criminal behavior and biological abnormality might be caused by the same unidentified environmental factor.

## LOMBROSO'S CONTEMPORARIES

Lombroso's theories sparked great controversy and won him avid supporters as well as serious critics. One of his critics, Charles Goring (1870–1919), found Lombroso's methods imprecise and inadequate. In *The English Convict*, published in 1913, Goring described his use of the *biometric method* to study three thousand English convicts.[5] The biometric method applies precise statistical tests to the study of human characteristics.

Goring rejected Lombroso's claims of biological determinism. In measuring such traits as distance between the eyes, head circumference, weight, hearing, and hair and eye color, he found little difference in the physical characteristics of criminals and noncriminals. Goring discovered, however, that criminal behavior bore a significant relationship to a condition he referred to as "defective intelligence." Consequently, Goring believed that criminal behavior was inherited and could therefore best be controlled by regulating the reproduction of families exhibiting such traits as "feeblemindedness, epilepsy, insanity, and defective social instinct."[6]

A contemporary of Lombroso and Goring, Raffaele Garofalo (1852–1934) occupies a theoretical middle ground between them. On the one hand, he shared Lombroso's belief that certain physical characteristics indicate a criminal nature. For example, he stated that among criminals "a lower degree of sensibility to physical pain seems to be demonstrated by the readiness with which prisoners

Case 1:06-cv-01657-RCL    Document 1-3    Filed 09/26/2006    Page 8 of 17

submit to the operation of tattooing."[7] But despite his respect for Lombroso, Garofalo argued that no proof of the existence of a criminal or delinquent type had been produced and that murderers and other serious criminals manifest many different physical traits. Garofalo explained deviant behavior with his concept of *psychic*, or *moral, anomaly*—the criminal's lack of compassionate and altruistic feelings, a lack that has an organic root. The moral anomaly, said Garofalo, is a psychic force found more frequently in so-called inferior races and transmitted through heredity. Though environment plays a role in the development of criminality, internal factors predominate. They include the "instincts" that are congenital or inherited or that are acquired in early infancy and thereafter become inseparable from the "psychic organism."

Finally, Garofalo recognized the differences among individual criminals and suggested that criminals be classified as murderers, who are totally lacking in humanity, or as lesser criminals, who in turn should be classified as violent criminals, thieves, and lascivious criminals (sexual offenders).

Enrico Ferri (1856–1929) is identified along with Lombroso and Garofalo as part of "the holy three of criminology." A student of Lombroso, Ferri believed that a number of biological, social, and organic factors caused delinquency and crime.[8]

As late as 1939, Ernest Hooton, a supporter of Lombroso, argued that the criminal was biologically and socially inferior. "In every population," Hooton concluded, "there are hereditary inferiors in mind and in body as well as physical and mental deficients. . . . Our information definitely proves that it is from the physically inferior element of the population that native born criminals from native parentage are mainly derived."[9] According to Hooton, the social and environmental factors associated with crime include low-status occupations, divorce, and lack of education. The physical factors associated with criminality are tattooing, thin hair, straight hair, red-brown hair, low sloping foreheads, mixed eye color (a sign of racial impurity), thin lips, long thin necks, and several other features. These concepts are no longer taken seriously.

## THEORIES OF HEREDITY

Another early branch of biocriminology focused on human heredity and its relationship to deviant behavior. This position held that physical traits may indeed produce criminal behavior and that possession of physical abnormalities can be transmitted genetically from one generation to the next. The result is crime-producing, crimogenic families.

Advocates of this *psychobiological*, or inheritance, theory studied the family trees of criminal and delinquent offenders. They traced the activities of several generations of families believed to have an especially large number of criminal members. The most famous of these studies involved the Jukes and the Kallikaks. Richard Dugdale's book, *Crime, Pauperism, Disease and Heredity* (1910), and Arthur Estabrook's later work, *The Jukes in 1915*, traced the history of the Jukes, a family responsible for a disproportionate amount of crime. Dugdale concentrated his efforts on one branch of the family tree, the offspring of Ada Jukes, whom he labeled the "mother of criminals." Dugdale succeeded in locating over 1,000 of her descendants and found that they included 280 paupers, 60 thieves, 7 murderers, 140 criminals, 40 persons with venereal disease, 50 prostitutes, and other assorted deviants. Estabrook studied the Jukes family even more closely and accumulated data on 2,000

members. He found an additional 170 paupers, 118 criminals, 378 prostitutes, and still more assorted deviants.[10]

In an associated effort, Henry Goddard studied the offspring of Martin Kallikak, who lived during the time of the American Revolution. Kallikak first had an illegitimate son by a woman of "low-born" family and then married into a "good" family. Goddard located 480 relations of the illegitimate offspring and 496 descendants of Kallikak's marriage. The former group contained substantially more deviant and criminal members than the latter group. The immediate implication of these studies was that undesirable hereditary characteristics, even in distant relatives, were enough to condemn succeeding generations of a family to a life of criminal degeneracy. Again, criminals were seen as being "born and not made."[11]

Studies like these were taken quite seriously in their time. Of course, the writings of the heredity school are no longer considered valid. Even if more families like the Jukeses or Kallikaks could be located, this alone would not prove that psychodegeneracy is a cause of crime. Considering the thousands of family bloodlines within the United States, it can be expected that a few will produce a disproportionate number of deviants. Furthermore, many of the "best" families have produced murderers and thieves. Finally, the heredity theory provides no explanation why many members of psychodegenerate families live perfectly normal lives and become productive members of their communities.

## BODY-BUILD THEORIES

Another independent branch of biocriminology was the body-build, or *somatotype*, school. Advocates of this approach argued that criminals manifest distinct physiques that make them susceptible to particular types of criminal behavior.

One of the first criminologists to link body type with delinquency was Ernst Kretschmer. He identified two distinct types, the *cyclothyme* and the *schizothyme.* Cyclothymes are spontaneous and lack sophistication. They are soft-skinned, with little muscle, and are kindhearted, tractable, sociable, talkative, and sometimes rash. Schizothymes have strong reactions and are apathetic and wayward in their nature. Their build is either tall and flat or wide, muscular, and strong. Kretschmer believed that cyclothymes were less serious delinquents and criminals and that schizothymes were more serious ones.[12]

William H. Sheldon also linked body type to delinquency.[13] In his analysis of youth, Sheldon discovered the existence of three basic body types. *Mesomorphs* have well-developed muscles and an athletic appearance. They are active, aggressive, and sometimes violent and are the most likely to become criminals. *Endomorphs* have heavy builds and are slow moving. They are known for lethargic behavior. *Ectomorphs* are tall and thin, less social, and more intellectual than the other types. Sheldon believed that most people maintained in their physical structure elements of all three body builds. He classified convicted offenders according to their body builds in a process he called *somatotyping.* Sheldon also believed there was a strong relationship between somatotype and psychiatric disorder.

Recent studies of the relationship of body build to delinquency were conducted by Sheldon Glueck and Eleanor Glueck. The Gluecks used Sheldon's three body types and added a fourth, a "balanced type" that included boys with no discernible dominant body type. In a lengthy research effort involving large samples of delinquent and nondelinquent boys, the Gluecks found that mesomorphs were disproportionately represented among delinquent boys (60.1 percent versus 30.7 percent).

Conversely, only 14.4 percent of the delinquents were ectomorphic; but 39.6 percent of the nondelinquents were ectomorphic.[14]

The Gluecks claim that a disproportionate number of delinquent youths may be mesomorphs because their strength and agility enable them to carry out the demands of the delinquent role. Endomorphs may be too slow and clumsy, and ectomorphs too fragile, to be successful delinquents. Recently, however, B. R. McCandless and his associates found no significant relationship between body build and self-reported delinquency. The link between physique and delinquency seems tenuous at best.[15]

## Modern Biocriminology and Sociobiology

*What seems no longer tenable at this juncture is any theory of human behavior which ignores biology and relies exclusively on socio-cultural learning. . . . Most social scientists have been wrong in their dogmatic rejection and blissful ignorance of the biological parameters of our behavior*[16]

Biological explanations of crime fell out of favor in the early twentieth century. During this period, criminologists became concerned about the psychological and social factors associated with crime (discussed in this chapter and the three following chapters). The work of Lombrosians and other biocriminologists was viewed as methodologically unsound, racist, and generally invalid.

Then, in the early 1970s, spurred by the publication of *Sociobiology*, by **E. O. Wilson**, the biological basis for crime once again emerged into the limelight.[17] **Sociobiology** differs from earlier theories of behavior in that it stresses that biological and genetic conditions affect the perception and learning of social behaviors, which in turn are linked to existing environmental structures. Sociobiologists view biology, environment, and learning as mutually interdependent factors. Thus, problems in one area can be altered by efforts in another. For example, people suffering from learning disorders can be given special tutoring to improve their reading skills. In this view, then, people are biosocial organisms whose personalities and behaviors are influenced by physical as well as environmental conditions.

Influenced by sociobiology, modern biocriminologists charge that traditional criminologists ignore the biological basis for human behavior. Sociologically trained criminologists disregard all the advances made in the sciences of biology and experimental psychology. Furthermore, traditional criminologists seem content to study reports of behavior, either through surveys or self-reports, rather than to observe the actual human behaviors they are allegedly concerned with.

Modern biocriminological theory has several outstanding principles. First, it rejects assumptions that all humans are born with equal potential to learn and achieve (*equipotentiality*) and that thereafter their behavior is controlled by social forces. Whereas traditional criminologists suggest (either explicitly or implicitly) that all people are born equal and that their parents, schools, neighborhoods, and friends control their subsequent development, biocriminologists argue that no two people are alike (with rare exceptions such as identical twins) and that the combination of human genetic traits and the environment produces individual behavior patterns.

A second critical focus of modern biocriminology is its position on learning. All social behavior, including criminal behavior, is learned. Each individual organism is believed to have a unique potential for learning. The physical and social

environment interact to either limit or enhance an organism's capacity for learning. People learn through a process involving the brain and central nervous system. Learning is not controlled by social interactions but by biochemistry and cellular interaction. Learning can take place only when physical changes occur in the brain.

C. Ray Jeffrey, a well-known biocriminologist, provides this model of behavior:

$$\text{Genetic code} \times \text{Environment} =$$
$$\text{Brain code} \times \text{Environment} = \text{Behavior}$$

He explains his position in this way:

> Genetic codes and brain codes are of a biochemical nature, involving the biochemical structure of genes and of neural transmission in the brain. The type of behavior (response) exhibited by an organism depends on the nature of the environment (stimulus) and the way in which the stimulus is coded, transmitted, and decoded by the brain and nervous system. . . .
>
> We do not inherit behavior any more than we inherit height or intelligence. We do inherit a capacity for interaction with the environment. Sociopathy and alcoholism are not inherited, but a biochemical preparedness for such behaviors is present in the brain which, if given a certain type of environment, will produce sociopathy or alcoholism.[18]

Jeffrey and other biocriminologists have been in the forefront of promoting biological research in criminology.

The following subsections will examine some of the more important issues in modern biocriminology.[19] First, we will look at how biochemical factors are believed to affect the learning of proper behavior patterns. Then we will turn to the relationship of brain function and crime. Finally, we will briefly consider current ideas about genetic factors and crime.

In reading this material, you should remember that biocriminology is a relatively new field. Many of the studies reported on here are case histories involving a few select subjects. Relatively few biocriminological studies involve rigorous scientific sampling, control group comparisons, and other validity checks. Therefore, rather than critiquing each study individually, it might be simpler to state that they represent conditional first attempts to study a complex phenomenon. If indeed there is a biosocial basis for crime, its undisputed proof will be for future research efforts to uncover.

## BIOCHEMICAL FACTORS

One major area of biocriminological interest involves biochemical factors, such as those produced by diet, environmental contaminants, and allergies. Though drugs and alcohol have also been linked to crime, they will be discussed in a later chapter (chapter 13).

**Vitamin and Mineral Deficiencies.** Sociobiologists maintain that minimum levels of vitamins and minerals are needed for brain growth, especially in the early years of life. Abnormal behavior can result from lack of these necessary vitamins and minerals. If people with normal needs for vitamins do not consume food that satisfies these needs, they will suffer from *vitamin deficiency*. If people have genetic

Case 1:06-cv-01657-RCL    Document 1-3    Filed 09/26/2006    Page 12 of 17

Bio-criminologists have linked eating junk food and sweets to violent and aggressive behavior.



conditions that cause greater-than-normal needs for vitamins and minerals, they are said to suffer from *vitamin dependency.*

People with vitamin deficiency or dependency can manifest many physical, mental, and behavioral problems. They may suffer severe distortions in seeing, hearing, and other special senses. For example, alcoholics often suffer from thiamine deficiency because of their poor diets and consequently are susceptible to the serious, often fatal Wernicke-Korsakoff disease.[20]

Research studies examining the relationship between crime and vitamin deficiency/dependency have seemed to find a close link between antisocial behavior and insufficient quantities of some B vitamins—$B^3$ and $B^6$—and vitamin C. In addition, studies have purported to show that a major proportion of all schizophrenics and children with learning and behavior disorders are dependent on vitamin $B^3$ and $B^6$.[21] Leonard Hippchen, a leading biocriminologist, found that medical research has identified vitamin $B^3$ dependency as a major cause of hyperactivity among youth.

In another study on the effect of diet on such crime-related acts as aggression and hostility, J. Kershner and W. Hawke evaluated the effect that a high-protein, low-carbohydrate, sugarless diet, supplemented by megavitamins, had on children labeled as having behavior problems.[22] Kershner and Hawke asked the subjects' parents to evaluate their children on thirteen behavior qualities, including hyperactivity, aggression, and attention span. The researchers discovered that children had significantly improved behavior patterns and that improved diet was the most important factor in producing positive change.

Some recent efforts have continued to observe the effect of diet on behavior. For example, Stephen Schoenthaler conducted an experiment with 276 incarcerated youths to determine whether a change in the amount of sugar in their diet

would have a corresponding influence on their behavior within the institutional setting.[23] In the experiment, several dietary changes were made: sweet drinks were replaced with fruit juices; table sugar was replaced with honey; breakfast cereals with high sugar content were eliminated; molasses was substituted for sugar in cooking; and so on. Schoenthaler found that these changes produced a significant reduction in disciplinary actions within the institution: the number of assaults, thefts, fights, and disobedience within the institution declined about 45 percent. It is important to note that these results were consistent when such factors as age, previous offense record, and race of the offender were considered.

These are but a few of hundreds of current studies to determine whether there is a link between biochemistry and behavior. As a whole, these efforts seem to be saying that in every segment of society there are violent, aggressive, and amoral people and that improper food, vitamin, and mineral intake may be responsible for their antisocial behavior.

**Hypoglycemia.** *Hypoglycemia* occurs when glucose (sugar) in the blood falls below levels necessary for normal and efficient brain functioning. The brain is sensitive to the lack of blood sugar because it is the only organ that obtains its energy solely from combustion of carbohydrates. Thus, when the brain is deprived of blood sugar, it has no alternate food supply to call upon, and its metabolism slows down, impairing its function. Symptoms of hypoglycemia include irritability, anxiety, depression, crying spells, headaches, and confusion.

Research studies have linked hypoglycemia to outbursts of antisocial behavior and violence. As early as 1943, D. Hill and W. Sargent linked murder to hypoglycemia.[24] Several studies have related assaults and fatal sexual offenses to hypoglycemic reactions.[25]

Hypoglycemia has also been connected with a syndrome characterized by aggressive and assaultive behavior, glucose disturbance, and brain dysfunction. Studies of jailed inmates and prison inmate populations have found a higher than normal level of hypoglycemia.[26]

**Testosterone.** *Testosterone* is a principal male steroid hormone. It controls secondary sex characteristics such as facial hair and voice timbre in males. Evidence suggests that its production levels may be strongly related to criminal aggressiveness in human males. L. E. Kreuz and R. M. Rose found in a sample of inmates that testosterone levels were higher in men who committed violent crimes than in the other prisoners, though results of comparisons with a noncriminal control group were nonsignificant.[27] Nonetheless, other studies, especially those by Richard Rada, could not distinguish between violent and nonviolent offenders on the basis of their testosterone levels.[28]

Despite the uncertainty of evidence linking testosterone to crime, drugs decreasing testosterone levels have been used to treat male sex offenders. Sarnoff Mednick and Jan Volavka warn that the long-term side effects of such treatment are still problematic.[29] In a similar vein, administration of the female hormone *estrogen* to sexually active men has led to a decrease in their sexual potency. Consequently, estrogen and another female hormone, progesterone, have also been used to manage sex offenders.[30]

**Allergies.** Sociologists are also concerned with the effect of cerebral allergies and neuroallergies on criminal and otherwise deviant behavior. In general, allergies are defined as unusual or excessive reactions of the body to a foreign substance.[31] For



example, hay fever is an allergic reaction caused when pollen cells enter the body and are fought or neutralized by the body's natural defenses. The result of the battle is itching, red eyes, and active sinuses. *Cerebral allergies* cause an excessive reaction of the brain, whereas *neuroallergies* affect the nervous system.

Neuroallergies and cerebral allergies are believed to cause the allergic person to produce enzymes that attack wholesome foods as if they were dangerous to the body.[12] They may also cause swelling of the brain, which can produce mental, emotional, and behavioral problems including hyperemotionality, aggressiveness, and violent behavior. Neuroallergy and cerebral allergy problems have also been linked to hyperactivity in children, which may portend antisocial behavior and the labeling of children as potential delinquents. The foods most commonly involved in producing such allergies are cow's milk, wheat, corn, chocolate, citrus, and eggs; however, about three hundred other foods have been identified as allergens.

The potential seriousness of the problem has been raised by studies linking the average consumption of one suspected cerebral allergen—corn—to cross-national homicide rates.[13]

**Environmental Contaminants.** Recently, biocriminologists have begun to focus on the effects of environmental contaminants on behavior. Increasing amounts of lead, copper, cadmium, mercury, and inorganic gases such as chlorine and nitrogen dioxide have been found in the ecosystem. At high levels, these substances can cause severe illness or death; at more moderate levels, they have been linked to emotional and behavioral disorders.[14]

Some studies have linked food additives to crime. For example, C. Hawley and R. E. Buckley claim that food dyes and artificial colors and flavors can produce hostile, impulsive, and otherwise antisocial behavior in youths.[15]

Other research efforts have been directed at measuring the influence of lead on youths' behavior. For example, in one study of hyperactive children who manifested conduct problems and other antisocial behavior, Oliver David and his associates found that lead in the bloodstream may have had an important role in explaining the onset of the behavior.[16]

Lighting may be another important environmental influence on antisocial behavior. Research projects have suggested that radiation from artificial light sources such as fluorescent tubes and television sets may produce antisocial, aggressive behavior.[17]

## NEUROPHYSIOLOGICAL STUDIES

Another area of sociobiology of particular interest to criminology is *neurophysiology*, or the study of brain activity. In most instances, the research focus has been on the *electroencephalogram* (EEG), which measures the electronic pulses of the brain. The EEG has been used to compare patterns of activity found in criminal and noncriminal populations. Yet, this is only one aspect of neurocriminology. This section will discuss various brain function patterns that have been related to criminality.

**Minimal Brain Dysfunction.** *Minimal brain dysfunction* (MBD) is related to an abnormality in cerebral structure. It has been defined as abruptly appearing, maladaptive behavior that interrupts the lifestyle and life flow of an individual. In its most serious form, MBD has been linked to serious antisocial acts, an imbalance

in the urge-control mechanisms of the brain, and chemical abnormality. Included within the category of minimal brain dysfunction are several abnormal behavior patterns, including dyslexia, visual perception problems, hyperactivity, poor attention span, temper tantrums, and aggressiveness.

One type of minimal brain dysfunction that has been of great concern to biocriminologists manifests itself through episodic periods of explosive rage. This form of the disorder is considered an important cause of such behavior as wife beating, child abuse, suicide, aggressiveness, and motiveless homicide. One perplexing feature of this syndrome is that people who are afflicted with it often maintain warm and pleasant personalities between episodes of violence.

Some studies have attempted to measure the presence of minimal brain dysfunction in offender populations. R. D. Robin and his associates found that 60 percent of a sample of suicidal adolescents exhibited brain dysfunction on psychological tests.[38] Similarly, R. R. Monroe found that almost all prison subjects he tested manifested significant neurophysiologic dysfunction.[39] L. T. Yeudall studied sixty criminal patients and found that they were characterized by lateral brain dysfunction of the dominant hemisphere of the brain. His data helped him predict with 95-percent accuracy the recidivism of violent criminals.[40]

Of interest to both educators and criminologists is the relationship between MBD and the so-called learning-disabled child. Research has shown that although *learning-disabled* (LD) children violate the law at the same rate as non-LD children, they are overrepresented in official arrest and juvenile court statistics.[41]

**EEG Abnormality.** As explained earlier, the electroencephalogram (EEG) records the electrical impulses given off by the brain. Measurements of the EEG reflect the activity of neurons located in the cerebral cortex. The rhythmic nature of this brain activity is determined by mechanisms that involve subcortical structures, primarily the thalmus portion of the brain. The EEG represents a signal composed of various rhythms and transient electrical discharges, commonly called brain waves, which can be recorded by electrodes placed on the scalp. The frequency is given in cycles per second, measured in hertz (Hz), and usually ranges from 0.5 to 30 Hz.

In what is considered the most significant investigation of EEG abnormality and crime, a randomly selected group of 335 violent delinquents was divided into those who were habitually violent and those who had committed a single violent act. While 65 percent of the habitually aggressive had abnormal EEG recordings, only 24 percent of the second group had recordings that deviated from the norm. When the records of individuals who had had brain damage, were mentally retarded, or were epileptic were removed from the sample, the percentage of abnormality among boys who had committed a solitary violent crime was the same as that of the general population, about 12 percent. However, the habitually aggressive subjects still showed 57-percent abnormality.[42]

Other research efforts have linked abnormal EEG recordings to antisocial behavior in children. Although about 5 to 15 percent of normal youths have abnormal EEG readings, about 50 to 60 percent of those with behavior disorders display abnormal recordings. In studies of problem children, about half were found to have abnormal EEG activity. Behaviors highly correlated with abnormal EEG included poor impulse control, inadequate social adaptation, hostility, temper tantrums, and destructiveness.[43]

Studies of adults have associated slow and bilateral brain waves with hostile, hypercritical, irritable, nonconforming, and impulsive behavior. Psychiatric pa-



Case 1:06-cv-01657-RCL    Document 1-3    Filed 09/26/2006    Page 16 of 17

tients with EEG abnormalities have been reported to be highly combative and to suffer episodes of rage. Studies of murderers have shown that a disproportionate number manifest abnormal EEG rates.[44]

There is evidence that abnormal EEG readings are linked to violent behavior, but a great many studies have found little relationship between the two.[45] In addition, research that concludes that abnormal EEG readings are associated with violence has lacked the precision needed to give it predictive value. For example, even if half of all violence-prone people had abnormal EEG ratings, there would still be too many nonviolent people with abnormal EEGs for researchers to conclude that EEG abnormality was a cause of violence.

**Other Brain Dysfunctions.** It is possible that brain disease can also be related to violent crime. The presence of brain tumors has been linked to a wide variety of psychological problems, including personality changes, hallucinations, and psychotic episodes. There is evidence that people with tumors are prone to depression, irritability, temper outbursts, and even homicidal attacks.[46]

Clinical case studies of patients suffering from brain tumors indicate that they may undergo behavior changes so great that previously docile people attempt to seriously harm their families and friends; when the tumor is removed, their behavior returns to normal.[47]

One well-known case involved Charles Whitman, who, after killing his wife and his mother, barricaded himself in a tower at the University of Texas with a high-powered rifle and proceeded to kill fourteen people and wound twenty-four others before he was killed by police. An autopsy revealed that Whitman suffered from a malignant infiltrating tumor. Whitman had previously experienced uncontrollable urges to kill and had actually gone to a psychiatrist seeking help for his problems. He kept careful notes documenting his feelings and his inability to control his homicidal urges, and left instructions for his estate to be given to a mental health foundation so it could study mental problems such as his. Nevertheless, it is still uncertain whether Whitman's tumor actually caused his behavior.[48]

In addition to brain tumors, head injuries caused by accidents such as falls or auto crashes have been linked to personality reversals marked by outbursts of antisocial and violent behavior. A variety of central nervous system diseases including cerebral arteriosclerosis, epilepsy, senile dementia, Korsakoff's syndrome, and Huntington's corea have also been associated with memory deficiency, orientation loss, and affective (emotional) disturbances dominated by rage, anger, and increased irritability.[49]

## 🐾 GENETIC INFLUENCES

The earliest biocriminological studies stressed the genetic basis of criminality. Today, biocriminologists are still concerned with the role heredity plays in producing crime-prone people. Evidence exists that animals can be bred to have aggressive traits; pit bulldogs, fighting bulls, and fighting cocks have been selectively mated to produce superior predators. Of course, no similar data are available for people, but some studies have attempted to document genetic factors associated with criminality. The most important of these studies are examined next.

**Chromosome Studies: The XYY Controversy.** Chromosomes—microscopic structures contained in cell nuclei—carry the basic genetic material, genes. Human beings normally have forty-six chromosomes, of which forty-four determine the

shape and structure of the body and two determine sex. The typical male chromosome contingent is recorded as 46, XY; and the female, as 46, XX.[50]

Sometimes an individual possesses greater or fewer than the normal chromosome complement because of problems encountered soon after the onset of life. Of concern are males who have an extra Y chromosome—the 47, XYY syndrome. Males can also possess an extra X chromosome (47, XXY), but this condition is of less importance to criminology.

Several early studies on the XYY phenomenon reported XYY males to be very tall individuals with a disproportionate inclination to commit crimes of violence.[51] Surveys of tall men in institutions for the mentally ill and prisons suggested that the rate of persons found to have an extra Y chromosome was greater than the rate estimated for the population at large.[52] The XYY syndrome received a great deal of publicity when Richard Speck, the convicted killer of eight nurses in Chicago, was said to be an XYY. There was much public concern that all XYYs were potential killers and should be closely controlled. Civil libertarians expressed fear that all XYYs could be labeled dangerous and violent regardless of whether they had engaged in violent activities.[53] (Later research found that Speck did not actually have an extra Y chromosome.)

The most current research has cast doubt on the XYY hypothesis. Biocriminologists have found that the proportion of XYYs in the prison population is not significantly higher than in the population at large (about 1 in 700 male births). However, some evidence shows that the number of XYY males in secure mental hospitals is higher than would be expected by chance alone.[54]

A cohort study was recently conducted in Denmark in which the cohort consisted of all the 31,436 men born in Copenhagen in the years 1944 through 1947.[55] All tall men over 184 centimeters—about 6 feet—were visited in their homes and asked to give blood samples and undergo chromosome analysis. Twelve XYY men were identified. It was found that they had little or no recorded evidence of violent behavior. The XYYs did engage in more criminal behavior than the non-XYY males of their height, age, and class; and there was some evidence that their EEG patterns were somewhat abnormal; but the fact that they had not engaged in violence seriously damaged the hypothesized association of XYY and violence. Though further research is being conducted on the link between XYY and violence, the issue has become less important.

**Twin Studies.** If in fact inherited traits cause criminal behaviors, it should be expected that twins would be quite similar in their antisocial activities. However, since twins are usually brought up in the same household and exposed to the same set of social conditions, it would be difficult to determine whether their behavior was a result of biological, sociological, or psychological conditions. Biocriminologists have tried to overcome this dilemma by comparing identical, monozygotic (MZ) twins with fraternal, dizygotic (DZ) twins of the same sex.[56] MZ twins are genetically identical, while DZ twins have only half their genes in common. If heredity does determine criminal behavior, we should expect that MZ twins would be much more similar in their antisocial activities than DZ twins.

The earliest studies conducted on the behavior of twins detected a significant relationship between the criminal activities of MZ twins and a much lower association between those of DZ twins. In a review of relevant studies conducted between 1929 and 1961, Sarnoff Mednick and Jan Volavka found that, overall, 60 percent of MZ twins shared criminal behavior patterns (if one twin was criminal,

Case 1:06-cv-01657-RCL    Document 1-4    Filed 09/26/2006    Page 1 of 13

so was the other), while only 30 percent of *DZ* twins were similarly related.[57] These findings may be viewed as powerful evidence that a genetic basis for criminality exists.

More recent studies have supported these basic findings, though the level of association found between the behaviors of *MZ* twins is somewhat lower than previously thought. For example, Karl Christiansen studied 3,586 male twin pairs and found a 52-percent concordance for *MZ* pairs and a 22-percent concordance for *DZ* pairs. This result suggests that the identical *MZ* twins may share a genetic characteristic that increases the risk of their engaging in criminality.[58]

Similarly, David Rowe and D. Wayne Osgood analyzed the factors that influence the correlation between self-reported delinquency and delinquency of friends in a sample of twin pairs.[59] They evaluated three distinct factors: genetic variations, common environmental influences that affect family members equally, and specific environmental factors that influence the individual uniquely. They found that genetic influences actually explain greater variation in delinquency rates than the other variables. However, this does not mean that delinquents are genetically inferior or damaged. For example, the genetic component could be manifested through intelligence (IQ), and thus linked to delinquency through school failure and academic underachievement.

Can we conclude from this evidence that criminality is genetically predetermined? Mednick and Volavka offer several explanations for the *MZ* twins' higher criminality relationship. Say, for example, that a physical characteristic such as height were related to committing crimes; *MZ* twins would more likely both be tall than *DZ* twins, since height is genetically transmitted. Or, say that alcohol addiction increased the probability that someone would engage in antisocial behavior; it is possible that alcohol addiction is related to genetic factors more likely to be shared by *MZ* twins than by *DZ* twins. Put another way, a relationship between genetics and criminality might be accomplished through the influence of some undisclosed intervening variable. However, the authors conclude that:

> Despite the limitations of the twin method, the results of these studies are compatible with the hypothesis that genetic factors account for some of the variance associated with antisocial behavior.[60]

**Adoption Studies.** Another approach that has been used to determine whether heredity influences criminality has focused on the behavior of adopted children. The logic behind this line of inquiry is that if children's behavior is more similar to that of their biological parents than to that of their adoptive parents, then the idea of a genetic basis for criminality would be supported. If, on the other hand, adoptees are more similar to their adoptive parents than their biological parents, an environmental basis for crime would seem more valid.

Several studies indicate that some relationship may exist between biological parents' behavior and the behavior of their children, even when their contact has been infrequent. In one major study, Barry Hutchings and Sarnoff Mednick analyzed 1,145 male adoptees born in Copenhagen, Denmark between 1927 and 1941; of these, 185 had criminal records.[61] After following up on 143 of the criminal adoptees and matching them with a control group of 143 noncriminal adoptees, Hutchings and Mednick found that the criminality of the biological father was a strong predictor of the child's criminal behavior. Moreover, the researchers found that when *both* the biological and the adoptive father were criminal, the probability

159

that the youth would engage in criminal behavior greatly expanded. Consequently, the authors concluded that both biological and environmental factors influence crime. These results were duplicated in studies by Sarnoff Mednick and his associates, using a sample of 14,427 adoptees born in Denmark between 1924 and 1947.[62]

Findings from twin and adoption studies have not refuted the hypothesis that there is some genetic basis to criminality. Although the evidence is not conclusive, it has been used to give preliminary support to the association of heredity, environment, and criminality.

## EVALUATION OF THE BIOLOGICAL PERSPECTIVE

Biological explanations of crime raise some challenging questions for criminology. These theories have been challenged by critics, who suggest they are racist and dysfunctional. If biology can explain the cause of street crimes such as assault, murder, or rape, the argument goes, and if the poor and minority group members commit a disproportionate number of such acts, then by implication biological theory says that members of these groups are biologically different or inferior. Biological theory is challenged because it seemingly ignores the effect of a crime-producing social environment. Furthermore, biological theory seems to divide people into criminals and noncriminals on the basis of their physical makeup, and ignores that almost everyone has engaged in some type of illegal activity at some time.

Modern biocriminologists, however, believe that their approach should not be confused with Lombrosian, deterministic biology. Rather than suggest that there are born criminals and noncriminals, they maintain that some people carry within them the potential to be violent or antisocial and that environmental conditions can sometimes trigger antisocial responses. This would explain why some otherwise law-abiding citizens engage in a single, seemingly unexplainable antisocial act and, conversely, why some people with long criminal careers often engage in conventional behavior.

Biological explanations may also account in part for cultural discrepancies in crime rates. The environment is viewed as a triggering mechanism; and it is possible that people living in high-poverty, high-crime inner-city areas are more likely to experience crime-producing stimuli than people living in more affluent neighborhoods. Moreover, wealthier citizens are better equipped to compensate for adverse biological conditions by diet, treatment, medication, and education. For example, in a wealthy school district, parents of a child who is suffering from a minimal brain dysfunction may avail themselves of special education and treatment programs unavailable in less affluent districts.

The major drawback to the biological perspective, as indicated earlier, is lack of adequate empirical testing. In most research efforts, sample sizes are relatively small and poorly chosen. Even more serious is the fact that a great deal of biocriminological research is conducted with samples of adjudicated offenders who have been placed in clinical treatment settings. Thus, we can never be sure whether findings apply only to offenders who have been convicted of crimes and placed in treatment or to the population of criminals as a whole. Consequently, the true relationship being measured could be that between biological traits and arrest or conviction, not between biological traits and criminality. Thus, a great deal more research is needed if biological explanations of crime are to be considered truly

**P**
**T**
**C**



iently,
luence
s asso-
4 and

is that
lusive,

envi-

ology.
st and
ssault,
mbers
ogical
ferior.
crime-
e peo-
), and
some

ld not
there
vithin
litions
erwise
t and,
nven-

ries in
ossible
ely to
thbor-
dverse
imple,
nimal
grams

is lack
itively
ocrim-
) have
nether
ced in
e true
est or
more
I truly

---

## CLOSE-UP

# Crime and Human Nature

In their book, *Crime and Human Nature*, James Q. Wilson and Richard Herrnstein synthesize elements of classical theory with biological and psychological concepts. In this controversial work they propose a theory of criminal behavior which holds that people choose criminal solutions when they believe that the rewards (material gain, peer approval, etc.) for their actions will outweigh any negative consequences (punishment, pangs of conscience, disapproval of onlookers, and so on). Various factors influence the decision to commit crime: the strength of the rewards, their certainty or delay, and the way rewards are valued and reinforced. But in general, Wilson and Herrnstein assume that criminal behavior is controlled by its consequences.

Wilson and Herrnstein argue that inherited constitutional factors influence the decision to commit crime. More specifically, they find that such individual factors as a low IQ, an abnormal body-type, and an impulsive personality predispose a person to choose criminal behaviors. Similarly, they agree with the evidence that criminal behavior tendencies are inherited through genetic transference. In sum, the authors believe that the factors predicting criminal behavior are genetic, and it follows that the decision to choose crime is also influenced by heredity.

Wilson and Herrnstein do not ignore social factors, however. They find that a poor and disrupted home life is a strong predictor of criminal behavior, whereas educational and community experiences have a more pe-

ripheral effect. Nonetheless, they believe that social variables have only a secondary or contributing influence on crime. People who have inherited impulsive and aggressive personality traits and limited intelligence will choose to commit crime. Since these tendencies are inherited it is no surprise that crime sometimes runs in families.

Wilson and Herrnstein believe that punishment can help convince an offender not to commit crime; but that the best defense to crime would be to help families reaffirm a sense of morality to their children. Crime-producing physical traits can be counteracted by a family life that stresses conventional values and teaches that crime is counterproductive.

Critics will be quick to point out that most studies showing that constitutional factors predispose people to commit crime are flawed, but *Crime and Human Behavior* should have a major effect on the criminological community.

**DISCUSSION QUESTIONS:**

1. Do you believe that crime can be inherited?
2. Do criminals have unique physical and mental characteristics?

SOURCE. James Q. Wilson and Richard Herrnstein, *Crime and Human Behavior* (New York: Simon and Schuster, 1985).

---

valid. However, as the following Close-Up, "Crime and Human Nature", suggests, biocriminology still has some influential supporters among leading criminologists.

## Psychological Theory of Crime

Psychologists, psychiatrists, and other mental health professionals have long played an active role in formulating criminological theory. In their quest to understand and treat all varieties of abnormal mental conditions, psychologists have encountered clients whose behavior falls within categories society has labeled criminal, deviant, violent, and antisocial. Since psychologists view all human behavior as a function of some mental process, it is not surprising that they would conclude that many criminal behaviors can be traced to personality disturbances. However, not even the staunchest supporter of psychological theory would suggest that all criminals are mentally ill, psychotic, psychopathic, or insane. Though some criminals are considered to possess highly disturbed personalities and therefore are not to be held legally responsible for their criminal activities, these criminals make up only a small percentage of offenders. Psychologists do, however, trace the onset of criminality to a person's mental process and, therefore, argue that criminologists will never understand the cause of criminality unless they determine the psychological processes that motivate it.

### EARLY PSYCHOLOGICAL THEORY

The earliest "psychological" view was that criminals were possessed by evil spirits or demons. Later theories suggested that mental illness and insanity were inherited and that deviants were inherently mentally damaged by reason of their inferior genetic makeup.

An early pioneer of the concept of insanity was the English physician Henry Maudsley (1835–1918). Maudsley believed that insanity and criminal behavior were strongly linked: "Crime is a sort of outlet in which their unsound tendencies are discharged; they would go mad if they were not criminals, and they do not go mad because they are criminals."[63]

Maudsley was a firm believer that criminal-producing mental traits are inherited, leading to long lines of crime-prone **mental degenerates.** He stated that people who become criminals do not have.the "aptitude of the higher industrial classes" and that they are "deficient in the power of attention . . . have bad memories and make slow progress in learning." Furthermore, Maudsley found criminals to be "inherently vicious," to "steal and lie with a skill hard to believe," to be "hopeless pupils," and to come from families in which insanity or some allied condition prevailed. In sum, Maudsley believed insanity to be a condition, passed from one generation to the next, that rendered the affected incapable of controlling their aggressive behavior.

Today, most psychologists do not believe that insanity is inherited. When they study crime, psychocriminologists usually address basic issues of human behavior: Why do people engage in violence and aggression? Is there such a thing as a criminal personality? Do childhood experiences influence adult criminality? However, as we shall see, there is by no means unanimity among psychologists over the answers to these questions.[64] Some psychologists view antisocial behavior from a **psychoanalytic perspective**—their focus is on early childhood experience and its effect on personality. Others use **cognitive theory** to explain crime—their view is that people's moral development is the key to understanding behavior. Behaviorists stress **social learning** and **behavior modeling** as the keys to criminality. **Psychobiologists** are concerned with the links among biological processes, human personality, and criminality. The following sections will review each of these perspectives independently.

### PSYCHOANALYTIC PERSPECTIVE: SIGMUND FREUD

Psychoanalytic psychology is the creation of the Viennese doctor **Sigmund Freud** (1856–1939). Psychoanalysis has become the most well-known and often-used theory of personality development.[65] Though many mental health professionals still use Freud's approach, there have been numerous efforts by his successors to expand, contradict, and reassess his pioneering concepts.

**Structure of Mind and Personality.** According to Freudian theory, the human mind performs three separate functions. The *conscious* mind is the aspect of the mind that people are most aware of—hunger, pain, thirst, desire. The *preconscious* mind contains elements of experiences that are out of awareness but can be brought back to consciousness at any time—memories, experiences. The *unconscious* part of the mind contains biological desires and urges that cannot readily be experienced as thoughts. Part of the unconscious contains feelings about sex and hostility, which people keep below the surface of consciousness by a process called **repression.**



Case 1:06-cv-01657-RCL    Document 1-4    Filed 09/26/2006    Page 5 of 13

Freud also postulated a three-part structure for the human personality. The *id,* the primitive part of people's mental makeup, is present at birth. It represents unconscious biological drives for sex, food, and other life-sustaining necessities. The id follows the *pleasure principle*—it requires instant gratification without concern for the rights of others.

The *ego* develops early in life, when an infant begins to learn that its wishes cannot be instantly gratified. The ego is that part of the personality that compensates for the demands of the id by helping people guide their actions to remain within the boundaries of social convention. The ego is guided by the *reality principle*—it takes into account what is practical and conventional by societal standards.

The *superego* develops as a result of incorporating within the personality the moral standards and values of parents, community, and significant others. It is the moral aspect of people's personalities; it passes judgments on their behavior.

All three parts of the personality operate to control behavior. People's id might demand pleasures, such as premarital sex; the superego makes them feel guilty for these desires; the ego works out a compromise—they can engage in some sexual activities, but they should not go "too far" or else they may "get in trouble."

**Development.** Freud postulates that the most basic human drive, or instinct, present at birth is *Eros,* the instinct to preserve and create life. Eros is expressed sexually. Consequently, very early in their development, humans experience sexuality, which is expressed in the seeking of pleasure through various parts of the body. During the first year of life, a child attains pleasure by sucking and biting; Freud called this the *oral stage.* During the second and third years of life, the focus of sexual attention is on the elimination of bodily wastes—the *anal stage.* The *phallic stage* occurs during the third year of life; children now focus their attention on their genitals. Males begin to have sexual feelings for their mother (the Oedipus complex) and girls for their fathers (the Electra complex). *Latency* begins at age six; during this period, feelings of sexuality are repressed until the *genital stage* begins at puberty; this marks the beginning of adult sexuality.

If conflicts are encountered during any of the psychosexual stages of development, a person can become **fixated** at that point. The person will as an adult exhibit behavior traits characteristic of those encountered during infantile sexual development. For example, an infant who does not receive enough oral gratification during the first year of life is likely as an adult to engage in such oral behavior as smoking, drinking, or drug abuse or to be clinging and dependent in personal relationships. Thus, the root of adult behavior problems can be traced to problems developed in the earliest years of life.

## POST-FREUDIAN PSYCHOANALYTIC THEORY

Freud's view of the mind and personality has influenced several competing versions of psychoanalytic theory.[66] For example, **Carl Jung** (1875–1961), one of Freud's inner circle, developed *analytical psychology.* According to Jungian theory, an important aspect of the human psychic structure is the *collective unconscious.* This comes to people by way of heredity and contains primitive images, a sort of racial memory of the past experience of the human species. Although these primitive images, or *archetypes,* remain unconscious, they influence human thought and emotion.

Alfred Adler (1870–1937) is credited with being the founder of *individual psychology.* Adler coined the term **inferiority complex.** Most people have feelings

of inferiority, Adler claimed, and compensate for them with a drive for superiority. Adler recognized that self-awareness plays an important part in personality and that people have a *creative self*, exhibited by the desire to overcome obstacles and develop individual potential.

Erik Erikson's (1902–1984) theory of *psychosocial development* holds that humans go through eight stages of ego development. From birth to one year, the infants learn to trust their mothers and become acclimated to their surroundings. Later stages find individuals trying to master fundamental skills, learning careers, becoming committed to love, being creative, and, finally, exhibiting wisdom and dignity. Erikson identified the **identity crisis**—a period of serious personal questioning people undertake in an effort to determine their own values and sense of direction.

## PSYCHOANALYSIS AND CRIMINAL BEHAVIOR

Freud did not spend much time theorizing about crime. He did link criminality to an unconscious sense of guilt a person retains because of his childhood Oedipus complex. He states:

> In many criminals, especially youthful ones, it is possible to detect a very powerful sense of guilt which existed before the crime, and is therefore not its result but its motive. It is as if it was a relief to be able to fasten the unconscious sense of guilt onto something real and immediate.[67]

However, following Freud, psychoanalysts have generally linked criminality to abnormal mental states produced by early childhood trauma.

Within classical Freudian theory, two mental conditions are thought to produce antisocial activity. A *neurosis* is a disorder characterized by extreme anxiety. It represents the feeling that repressed, unacceptable impulses may break through and take control. A more extreme form of mental disturbance is *psychosis,* abnormal behavior that impairs everyday functioning. Psychosis occurs when the primitive id functions take control of the personality.

Psychotics are people who manifest disturbances of thought, mood, and behavior. There are various specific psychotic disorders; of those, **schizophrenia** is perhaps most often linked to crime. Schizophrenics exhibit illogical and incoherent thought processes and a lack of insight into their behavior. They may experience delusions and hallucinate. For example, they may see themselves as agents of the devil, avenging angels, or the recipients of messages from animals and plants. David Berkowitz, the "Son of Sam" or "44-calibre killer," exhibited these traits. *Paranoid schizophrenics* suffer complex behavior delusions involving wrong-doing or persecution—they think everyone is out to get them.

The psychoanalyst whose work is most closely associated with using these concepts to explain criminality is **August Aichorn.**[68] After examining many delinquent youths, this Viennese doctor concluded that societal stress, though damaging, could not alone result in a life of crime unless a predisposition existed that prepared youths psychologically for antisocial acts. He labeled this state *latent delinquency.* Latent delinquency is found in youngsters whose personality requires them (1) to seek immediate gratification (to act impulsively), (2) to consider satisfaction of their personal needs more important than relating to others, and (3) to satisfy instinctive urges without consideration of right and wrong (that is, they lack guilt).

Psychoanalyst David Abrahamsen views the criminal as an id-dominated person who suffers from the inability to control impulsive, pleasure seeking drives.[69] Perhaps because they suffered unhappy experiences in childhood, or had families who could not provide proper love and care, criminals suffer from weak or damaged egos that make them unable to cope with conventional society. In its most extreme form, criminality may be viewed as a form of psychosis that prevents offenders from appreciating the feelings of their victims or controlling their own impulsive needs for gratification.

Psychiatrist Seymour Halleck views criminality as a manifestation of feelings of oppression and the inability of people to do much about it. Criminality actually allows troubled people to survive by producing positive psychic results: it helps them to feel free and independent, it gives them the possibility of excitement and the chance to use their skills and imagination, it provides them with the promise of positive gain, it allows them to blame others for their predicament (for example, the police), and it gives them a chance to rationalize their sense of failure ("If I hadn't gotten into trouble, I could have been a success").[70]

The views of psychoanalysts like Abrahamsen and Halleck are supported by research which shows that many serious, violent offenders suffer from some sort of personality disturbance. James Sorrells' well-known study of juvenile murderers, "Kids Who Kill," found that many homicidal youths could be described in such terms as "overtly hostile," "explosive or volatile," "anxious," and "depressed."[71] Likewise, in a recent study of forty-five males accused of murder, Richard Rosner and his associates found that 75 percent could be classified as having some mental illness, including schizophrenia.[72] However, as the following Close-Up entitled "Crime and Mental Disorder" suggests, there is little evidence that mentally ill people are generally violent or criminal.

It is evident from these statements that the psychoanalytic model of the criminal offender depicts an aggressive, frustrated person dominated by events that occurred early in childhood.

## COGNITIVE THEORY

Cognitive psychologists are concerned with people's mental processes—how they perceive and mentally represent the world they live in. They study problem solving, idea formation, dreams, and so on. The leading developers of this school were Wilhelm Wundt (1832–1920), Edward Titchener (1867–1927), and William James (1842–1920). The cognitive perspective contains several subgroups. *Gestalt* psychology is concerned with perception of the world in whole units rather than individual pieces. The *moral and intellectual development* branch is concerned with how adults morally represent and reason about the world. *Humanistic psychology* stresses self-awareness and "getting in touch with feelings."

**Moral and Intellectual Development Theory.** The moral and intellectual development branch of cognitive psychology is perhaps the most important for criminological theory. Jean Piaget (1896–1980), the founder of this approach, hypothesized that people's reasoning processes develop in an orderly fashion, beginning at birth and continuing until they are twelve years old and older.[73] At first, during the *sensorimotor stage*, children respond to the environment in a simple manner, seeking interesting objects and developing their reflexes. By the fourth



**CLOSE·UP**

# Crime and Mental Disorder

*The psychoanalytic perspective links serious, violent criminal behavior to psychosis. According to this view, people suffering from schizophrenia, paranoia, and so on will be more likely to commit violent, aggressive crimes. Conversely, a disproportionate number of people who commit violent crimes are probably suffering from some type of severe personality disturbance. Just how accurate is this view? That is, are the mentally ill more likely to become involved in crime than the mentally sound?*

To answer this question, psychologists John Monahan and Henry Steadman reviewed the existing body of literature on the relationship between mental disorder and crime. They found that the rate of mental disorder in a population must be thought of as either being the *true rate* (or the percentage of the population mentally ill) or the *treated rate* (the percentage of the population under treatment for mental illness). Some of the findings are summarized below.

There are two kinds of studies of the true and treated rates of crime and mental disorder. The first kind looks at "pure" cases, in which rates of mental disorder are computed for groups of criminals or crime rates are computed for groups of the mentally disordered. That is, the study covers people who are "purely" in one category and inquires as to those who also fall into the other category.

The second kind of study considers "mixed" cases— persons who are being treated as both criminal and

mentally disordered. These persons fall into various legal categories of "mentally disordered offenders."

## PURE CASES OF CRIMINAL BEHAVIOR OR MENTAL DISORDER

Findings from the available research on the true and treated rates of mental disorder among criminals—and the true and treated rates of crime among the disordered—are summarized in table A.

The scant research into mental disorder among persons who have been arrested ("true criminals") suggests that their rates of disorder are no higher than those of the general American population of comparable social class.

Several surveys have been made of the rates of mental disorder among persons in jails and prisons ("treated criminals"). These studies have reported rates of serious mental disorder ranging from 1 to 7 percent, whereas

**TABLE A**    Studies of pure cases of criminal behavior or mental disorder

| Relationship at issue | Amount of evidence | Findings compared with matched groups in the general population |
|---|---|---|
| True disorder among true criminals | Little | No higher |
| True crime among truly disordered | None | — |
| True crime among treated disordered | Much | No higher |
| Treated disorder among true criminals | None | — |
| True disorder among treated criminals | Much | No higher |
| Treated crime among truly disordered | None | — |
| Treated disorder among treated criminals | Little | No comparison data |
| Treated crime among treated disordered | Little | Unclear |

and final stage, the *formal operations stage,* they have developed into mature adults who can use logic and abstract thought.

Lawrence Kohlberg has applied the concept of moral development to issues in criminology.[74] He suggests that people travel through stages of moral development, during which their decisions and judgments on issues of right and wrong are made for different reasons. It is possible that serious offenders have a moral orientation that differs from that of law-abiding citizens. Kohlberg's stages of development are:

STAGE 1—Right is obedience to power and avoidance of punishment.
STAGE 2—Right is taking responsibility for oneself, meeting one's own needs, and leaving to others the responsibility for themselves.

rates of less severe mental disorders range from 15 to 20 percent. (Such questionable categories as sociopathy, alcoholism, and drug addiction are not included in these figures.) When comparing these rates with those found in surveys of the general population, it is necessary to recognize that jail and prison inmates are disproportionately persons of lower social class, and that such persons have disproportionately high rates of mental disorder. The conclusion that emerges: the rate of mental disorder among inmate populations does not exceed the rate of mental disorder among groups of comparable social class in the general community.

The following conclusions from the research appear justified:

- The arrest rate of mentally disordered offenders after their release from mental hospitals is very similar to the arrest rate of pure mental patients with a comparable prehospital arrest record.
- It is questionable how many persons legally adjudicated to be mentally disordered offenders are suffering from true mental disorder. The most frequent diagnosis given to mentally disordered sex offenders, for example, is "sexual deviation."
- The subsequent conviction rate of mentally disordered offenders (based on the little data that exist) is consistent with what one would predict from a knowledge of their criminal history and demographic characteristics.
- Likewise, the factors relating to the rehospitalization of pure mental patients (e.g., the number of times they have been hospitalized in the past) also seem to relate to the rehospitalization of mentally disordered offenders.

## MIXED CASES OF CRIMINAL BEHAVIOR AND MENTAL DISORDER

Studies of cases of persons treated simultaneously for criminal behavior and mental disorder lead to the conclusion that rates of crime and mental disorder are about what one would expect from a knowledge of their demographic characteristics and their experience with the mental health and criminal justice systems.

"Mentally disordered offenders" is an umbrella term, covering four legal categories: (1) persons judged incompetent to stand trial, (2) persons found not guilty by reason of insanity, (3) mentally disordered sex offenders, and (4) persons transferred from prison to a mental hospital.

## IMPLICATIONS

The correlates of crime among the mentally disordered appear to be the same as the correlates of crime among any other group: age, gender, race, social class, and prior criminality. Likewise, the correlates of mental disorder among criminal offenders appear to be the same as those in other populations: age, social class, and previous disorder. Populations characterized by the correlates of both crime and mental disorder (e.g., low social class) can be expected to show high rates of both, and they do.

It does appear from the data that, if one could excise approximately half the population of state mental hospitals (those with prior arrest records), then the remaining patients, on their release, would be no more criminal than the rest of us. However, the data do not reveal how this can be done without transferring many of these people to jails and prisons, and thereby aggravating the problems of those institutions.

In sum, Monahan and Steadman found little evidence that the mentally ill are any more criminal than the rest of society.

## DISCUSSION QUESTIONS

1. Does the finding that crime rates among the mentally ill are equivalent to those of the general population invalidate psychoanalytic theory?
2. Should a person who is evaluated as mentally ill by clinical personnel but legally sane under the law be responsible for their criminal actions?

SOURCE. Adapted from John Monahan and Henry Steadman, *Crime and Mental Disorder.* National Institute of Justice Research in Brief, Washington, D.C., September 1984. Footnotes omitted.

STAGE 3—Right is being good in the sense of having good motives, having concern for others, and "putting yourself in the other person's shoes."

STAGE 4—Right is maintaining the rules of a society and serving the welfare of the group or society.

STAGE 5—Right is based on recognized individual rights within a society with agreed-upon rules—a social contract.

STAGE 6—Right is an assumed obligation to principles applying to all humankind, principles of justice, equality, and respect for human personality.

Kohlberg classifies people according to the stage on this continuum at which their moral development has ceased to grow. In studies conducted by Kohlberg and his associates, criminals have been found to be significantly lower in their moral judgment development than noncriminals of the same social background.[75] The majority of noncriminals were classified in stages three and four, whereas a majority of criminals fell in stages one and two. Moral development theory, then, suggests that people who obey the law simply to avoid punishment or who have outlooks mainly characterized by self-interest are more likely to commit crimes than those who view the law as something that benefits all of society and who sympathize with the rights of others. Moral development theory suggests that growth to a higher stage of moral judgment probably insulates a person against criminal behavior. This is a relatively new field, and research efforts to examine its principles have not been extensive.

## BEHAVIOR THEORY AND THE SOCIAL LEARNING APPROACH

Behavior theory maintains that human actions are developed through learning experiences. Rather than focus on unconscious personality traits or cognitive development patterns produced early in childhood, behavior theorists are concerned with the actual behaviors people engage in during the course of their daily lives. The major premise of behavior theory is that people alter their behavior according to the reactions it receives from others. Consequently, behavior is constantly being shaped by life experiences. With respect to criminal activity, the behaviorist viewpoint is that crimes, especially violent acts, are learned responses to life situations and do not necessarily represent abnormal or morally immature responses.

**Social Learning Theory.** The **social learning** branch of behavior theory is the one most relevant to criminology, since it stresses the acquisition of violent and aggressive behavior patterns.[76] Social learning theorists, most notably **Albert Bandura**, argue that people are not actually born with the ability to act violently but that they learn to be aggressive through their life experiences. These experiences include observing others acting aggressively to achieve some goal or watching others being rewarded for violent acts on television, in movies, and so on. Simply put, people learn to act aggressively when as children they model their behavior after the violent acts of adults. Later in life, these violent behavior patterns persist in social relationships.

In the social learning view, psychological or biological factors may predispose a person toward violence, but the activation of a person's violent tendencies is achieved by factors in the environment. Therefore, Albert Bandura claims, the specific forms that aggressive behavior takes, the frequency with which it is expressed, the situations in which it is displayed, and the specific targets selected for attack are largely determined by social learning factors.

**Social Learning and Violence.** Social learning theorists view violence as something learned through a process called behavior modeling. In modern society, aggressive acts are usually modeled after three principal sources. Most prominent is the behavior model reinforced by family members. Bandura reports that studies of family life show that children who use aggressive tactics have parents who use similar behaviors when dealing with others.

A second influence on the social learning of violence is provided by environmental experiences. People who reside in areas in which violence is a daily oc-

which
hlberg
their
und.[75]
reas a
then,
have
crimes
d who
rowth
minal
ciples

rning
e de-
erned
lives.
rding
being
view-
itions

s the
t and
**Ban-**
y but
ences
thers
put,
after
ist in

spose
ies is
, the
s ex-
d for

ome-
iety,
nent
udies
use

iron-
oc-

---

## CLOSE-UP

### Television and Behavior

*One important social learning hypothesis is that children model their behavior after the behavior of characters they see on television. It matters little if they are real-life or cartoon figures, as long as they are rewarded for their aggressive behavior and the children can identify in some way with them. This relationship is particularly important when we consider the amount of violence on television programs. For example, when researchers at Pennsylvania University's Annenberg School of Communications monitored the number of programs containing violence and the number of violent acts per program from 1967 to 1979, they found that weekend daytime programming, usually directed at children, has the most violent content.*

There are several competing explanations for the effects television is said to have on behavior:

- Observational learning occurs when the violence seen on television is copied by the child viewer. Children learn to be violent from television in the same way that they learn cognitive and social skills from their parents and friends.
- Television violence increases the arousal levels of viewers and makes them more prone to act aggressively. Studies measuring the galvanic skin response of subjects—a physical indication of arousal based on the amount of electricity conducted across the palm of the hand—show that viewing violent television shows led to increased arousal levels in young children.
- Television violence promotes attitude changes, which can then result in behavior changes. Watching television violence promotes such negative attitudes as suspiciousness and the expectation that the viewer himself or herself will become involved in violence. Attitudes of frequent television viewers toward aggression become positive when they see violence as a common and socially acceptable behavior.
- Television violence helps already aggressive youths justify their behavior. It is possible that, instead of *causing violence*, television helps violent youths rationalize their behavior as a socially acceptable and common activity.
- Television violence may disinhibit aggressive behavior, which is normally controlled by other learning processes. Disinhibition takes place when adults are viewed as being rewarded for violence, and when

violence is seen as socially acceptable. This contradicts previous learning experiences in which violent behavior was viewed as wrong.

The evidence that watching violence on television is correlated with personal expressions of violence seems overwhelming. Hundreds of studies on the issue have been conducted. With few exceptions, they found that television has both an immediate, short-term influence and a lasting, long-term effect on behavior.

This evidence should not be interpreted to mean that all violent people became that way from watching television, or that watching television will automatically make a person violent. Millions of people watch violent films and television programs without ever becoming violent themselves. Some carefully conducted studies in which the television viewing of youths was observed over time have failed to show a significant link between watching violence on television and personal aggressive behavior. But the evidence does suggest that some people *are* influenced by television and that both parents and television executives should at least be sensitive to this problem.

#### DISCUSSION QUESTIONS

1. Should violent programs aimed at children be banned from network television?
2. Have you ever been influenced by a particularly violent television show or film?

SOURCE: D. Pearl, L. Bouthilet, and D. Lazar, eds., *Television and Behavior*, vols. 1 and 2 (Washington, D.C.: U.S. Government Printing Office, 1982).

---

currence are more likely to act violently than those whose subcultural affiliations stress conventional behavior.

A third source of behavior modeling is provided by the mass media. It has been commonplace for films and television shows to graphically depict violence. Moreover, violence is often portrayed as an acceptable behavior, especially for heroes who never have to face legal consequences for their actions. For example, David Phillips found the homicide rate increases significantly immediately after a heavyweight championship prize fight.[77] (See Close-Up entitled "Television and Behavior.")

Studies indicate that observing violence on TV can precipitate personal acts of violence.



What triggers violent acts? Various sources have been investigated by social learning theorists. One position is that a direct, pain-producing physical assault will usually trigger a violent response. Yet the relationship between painful attacks and aggressive responses has been found to be inconsistent; whether people counterattack in the face of physical attack depends in part on their skill in fighting and their perception of the strength of their attackers.

Verbal taunts and insults have also been linked to aggressive responses. People who are predisposed to aggression by their learning experience are likely to view insults from others as a challenge to their social status and to react with violence.

Still another violence-triggering mechanism is a perceived reduction in one's life conditions. Prime examples of this phenomenon are riots and demonstrations in poverty-stricken ghetto areas. Studies have shown that discontent also produces aggression in the more successful members of lower-class groups who have been led to believe they can succeed but have been thwarted in their aspirations. It is still uncertain how this relationship is constructed; however, it is apparently complex. No matter how deprived some individuals are, they will not resort to violence. It seems evident that people's perceptions of their relative deprivation have differing effects on their aggressive responses.

In summary, social learning theorists have said that the following four factors help produce violence and aggression:

1. An event that heightens arousal—such as a person's frustrating or provoking another through physical assault or verbal abuse.
2. Aggressive skills—learned aggressive responses picked up from observing others, either personally or through the media.
3. Expected outcomes—the belief that aggression will somehow be rewarded.

Case 1:06-cv-01657-RCL    Document 1-4    Filed 09/26/2006    Page 13 of 13

Rewards can come in the form of reducing tension or anger, gaining some financial reward, building self-esteem, or gaining the praise of others.

4. Consistency of behavior with values—the belief, gained from observing others, that aggression is justified and appropriate given the circumstances of the current situation.

### PSYCHOBIOLOGICAL PERSPECTIVE

*Psychobiologists*, or *physiological psychologists*, search for relationships among changes in brain cells, nervous system activity, and mental processes. They have used research techniques like electrical stimulation of areas of the brain to demonstrate that particular parts of the brain control a wide range of emotional and behavioral activity, ranging from sexuality to aggression.

Psychologists also have studied the effects of hormone and cell activity on behavior. Since these efforts are quite similar to those of biocriminologists, discussed earlier in this chapter, they need not be repeated here. However, two issues relating to biological psychology are of particular relevance to criminology and should be given some mention: the psychopathic personality and mental ability and crime.

**The Psychopath.** It has become commonplace for psychocriminologists to view morally indifferent people who have frequent brushes with the law as **sociopaths** or **psychopaths** (these terms are used interchangeably).[78] Clinicians view psychopaths as aggressive, dangerous, antisocial individuals who act in an unthinking and callous manner. They lack insight into their behavior and are likely to feel little remorse for their violent, aggressive, or criminal acts. Psychopaths neither learn from their mistakes nor are influenced by punishments. Though they may appear charming and may have at least average intelligence, they lack emotional depth and are incapable of loving others. Psychopaths have been described as having an unstable, transient lifestyle without long-term commitments. Nonetheless, they do not display clinically significant intellectual or psychiatric symptoms. Perhaps their most important feature is a low level of anxiety, which contributes to their lack of remorse or guilt over their misdeeds.

Psychopaths are likely to be very dangerous. If a person has no feelings for others and often acts on impulse, it follows that there will be little to bar him or her from expressing antisocial behavior. It is not surprising, therefore, that research studies show that people evaluated as psychopaths are significantly more criminal and violence-prone when compared to nonpsychopathic control groups. Moreover, as Robert Hare and Jeffrey Jutai report, psychopaths may continue their criminal careers long after other offenders "burn out" or "age out" of crime.[79] Psychopathy has also been linked to serious violent crimes such as mass murder or serial murder; this topic will be discussed further in chapter 9. Psychopaths are continually in trouble with the law, and therefore are likely to wind up in penal institutions. It has been estimated that up to 30 percent of all inmates can be classified as psychopaths or sociopaths, but a more realistic figure is probably 10 percent.[80] Nonetheless, not all psychopaths become criminals; conversely, most criminals are not psychopaths.

*Psychopathy and Physical Traits.* There are several suspected causes of the psychopathic personality. Some psychologists believe that early development and nur-

turing contribute to the condition. Among the suspected causes are a sociopathic father, parental rejection and lack of love during childhood, loss of a parent during childhood, and inconsistent discipline. The early relationship between mother and child is also quite significant. Children who lack the opportunity to form an attachment to a mother-figure in the first three years of life, who suffer sudden separation from the mother-figure, or who see changes in the mother-figure are most likely to develop psychopathic personalities.

Although developmental factors are a suspected cause of psychopathy, physical traits have also been linked to the antisocial personality.[81] One particular psychobiological concern is the link between psychopathy and the activity of the *autonomic nervous system* (ANS). The ANS mediates physiological activities associated with emotions and is manifested in such measurements as heartbeat rate, blood pressure, respiration, muscle tension, pupillary size, and electrical activity of the skin (called *galvanic skin resistance*, or GSR).

Some evidence indicates that psychopaths have lower skin conductance levels and fewer spontaneous responses than normal subjects. Research shows that this relationship is slight and inconsistent, but some recent studies do indicate the possibility that psychopaths have lower levels of arousal to environmental stimulations such as noises and pain than do control subjects. Similarly, psychopaths have been found to be less likely to show physiological signs that they are apprehensive about threatened pain and punishment than normal subjects. Put simply, psychopaths seem to react differently to physical sensations than nonpsychopaths. Research has been undertaken to determine whether psychopaths are therefore unlikely to experience anxiety and to be deterred by punishment. It has been found that clinically defined psychopaths who have had their levels of arousal increased through injections of the hormone adrenalin do in fact begin to respond as normal subjects do. It is possible that some psychopaths are thrill seekers who engage in high-risk activities to raise their general neurological level to a more optimal state.[82]

**IQ and Criminality.** A second biopsychological issue relating to crime is the controversy over the suspected relationship between intelligence and criminality. Some criminologists have maintained that many delinquents and criminals have a below-average intelligence quotient (IQ) and that low IQ is a cause of their criminality.

Early criminologists believed that low intelligence was a major cause of crime and delinquency. Criminals were believed to be inherently substandard in intelligence and thus naturally inclined to commit more crimes than more intelligent persons. If authorities could determine which individuals had low IQs, they might identify potential criminals before they committed socially harmful acts. Since social scientists had a captive group of subjects in training schools and penal institutions, they began to measure the correlation between IQ and crime by testing adjudicated offenders. Thus, inmates of penal institutions were used as a test group around which numerous theories about intelligence were built, leading ultimately to the *nature versus nurture* controversy that is still going on today. These concepts are discussed in some detail in the following sections.

*Nature Theory.* The nature theory argues that intelligence is largely determined genetically, that ancestry determines IQ, and that low intelligence as demonstrated by low IQ is linked to behavior, including criminal behavior.

When the newly developed IQ tests were administered to inmates of prisons

and juvenile training schools in the first decades of the century, the nature position gained support, because a very large proportion of the inmates scored low on the tests. Henry Goddard found during his studies in 1920 that many institutionalized persons were what he considered "febbleminded"; he concluded that at least half of all juvenile delinquents were mental defectives.[83] Goddard's results were challenged in 1931, when Edwin Sutherland evaluated IQ studies of criminals and delinquents and noted significant variation in their findings.[84] The discrepancies were believed to reflect refinements in testing methods and scoring rather than differences in the mental ability of criminals.

In 1926, William Healy and Augusta Bronner tested a group of delinquent boys in Chicago and Boston and found that 37 percent were subnormal in intelligence. They concluded that delinquents were five to ten times more likely to be mentally deficient than normal boys.[85]

These and other early studies were embraced as proof that low IQ scores indicated potentially delinquent children and that a correlation existed between innate low intelligence and deviant behavior.[86] IQ tests were believed to measure the inborn genetic makeup of individuals, and many criminologists accepted the idea that individuals with substandard IQs were predisposed toward delinquency and adult criminality.

*Nurture Theory.* The rise of culturally sensitive explanations of human behavior in the 1930s led to the nurture school of intelligence. This theory states that intelligence must be viewed as partly biological but primarily sociological. Nurture theorists discredited the notion that persons commit crimes because they have low IQs. Instead, they postulated that environmental stimulation from parents, relatives, social contacts, schools, peer groups, and innumerable others create a child's IQ level and that low IQs result from an environment that also encourages delinquent and criminal behavior. Thus, if low IQ scores are recorded among criminals, these scores may reflect the criminals' cultural background, not their mental ability.

Studies challenging the assumption that people automatically committed criminal acts because they had below-average IQs began to appear as early as the 1920s. John Slawson studied 1,543 delinquent boys in New York institutions and compared them with a control group of New York City boys in 1926.[87] Slawson found that although 80 percent of the delinquents achieved lower scores in abstract verbal intelligence, delinquents were about normal in mechanical aptitude and nonverbal intelligence. These results indicated the possibility of cultural bias in portions of the IQ tests. He also found that there was no relationship between the number of arrests, the types of offenses, and IQ.

Kenneth Eels and his associates found that tests used in the 1950s systematically underestimated the abilities of children of the working class. They argued that traditional intelligence tests predict who will succeed in a school system that makes use of abstract ideas and experiences that only middle-class children are likely to have: "There are reasoning abilities in the lower class that schooling could capitalize on if it were redesigned to be less verbal and culture-laden."[88] Robert Rosenthal and Lenore Jacobsen further debunked the notion that academic success and IQ scores were linked.[89]

*Recent Trends.* There is still great controversy over the nature of IQ and its relationship to criminal behavior. Many well-known scientists have come forward to claim that IQ is a function of genetic inheritance.

The new heredity theorists, particularly Arthur Jensen and Richard Herrnstein, argue that genetic factors account for much of the variability in intelligence as measured by standard IQ scores and that environmental factors account for little.[90] Jensen argues that race is the key to IQ differences; Herrnstein believes that social class is the determining factor. Both agree that the observable gap in intelligence between blacks and whites and lower- and middle-class groups will remain fixed as long as the environmental conditions with which heredity interacts do not change. Thus, although both men believe that intelligence has a genetic basis, they do not deny the influence of environmental factors.

Recently, however, social scientists have countered arguments based on heredity. In their study of black children adopted by white families, Sandra Scarr and Richard Weinberg found that social environment plays the dominant role in determining the average IQ level of the black children. Black adoptees scored as high on IQ tests as white adoptees in other studies. They conclude: "The dramatic increase in the IQ mean and the additional finding that placement and adoptive family characteristics account for a major portion of the IQ differences . . . suggest that the IQ score of these children is malleable."[91]

Scarr and Weinberg are currently conducting a long-term study of adoptees in Minnesota.[92] Their sample includes both black and white children adopted into middle-class families. A longitudinal study of these youths confirms that racial differences do not account for a major portion of IQ performance and that black and interracial children brought up in middle-class culture and schools perform as well as other adopted children in similar environments.[93] Thus, recent evidence seems to point to the influence of environment on IQ.

The contention that IQ scores are strongly related to crime has received support from Travis Hirschi and Michael Hindelang.[94] After reexamining several important research studies—Hirschi's own 1969 effort (see chapter 7), the work of Marvin Wolfgang and colleagues (see chapter 4), and research conducted by Joseph Weis—Hirschi and Hindelang conclude that "the weight of evidence is that IQ is more important than race and social class" for predicting criminal and delinquent involvement. Furthermore, they reject the notion that IQ tests are race- and class-biased (favoring middle-class whites) and therefore invalid. They find major differences between criminals and noncriminals within *similar* racial and socioeconomic class categories. Their major contention is that low IQ increases the likelihood of criminal behavior through its effect on school performance. That is, youths with low IQs do poorly in school, and school failure and academic incompetence are highly related to delinquency, and later to adult criminality.

These findings have been supported by research conducted by Terrie Moffitt, William Gabrielli, Sarnoff Mednick, and Fini Schulsinger.[95] Using results obtained from longitudinal studies conducted in Denmark, the researchers found a significant relationship between low IQ and delinquency. They conclude that children with a low IQ may be likely to engage in delinquent behavior because their poor verbal ability is a handicap in the school environment:

> Such initial experiences may contribute to later delinquency in many ways: by creating a negative attitude toward authority, by inducing a child to seek rewards in less socially desirable settings, or by making a child more sensitive to the effects of delinquent peer pressure when peers provide an important source of esteem.[96]

The true relationship between intelligence and crime is far from being settled.

Case 1:06-cv-01657-RCL    Document 1-5    Filed 09/26/2006    Page 4 of 13

## CRIME AND PERSONALITY TRAITS

So far, this section has viewed the concept of personality development and its relationship to criminality from four different psychological perspectives—the psychoanalytic, the cognitive, the behavioral, and the biological. All agree that human beings have the potential to develop abnormal, destructive personality characteristics, although they disagree on the process by which such development takes place.

To simplify the process by which psychologists evaluate personality, standardized tests have been constructed to measure traits associated with abnormal symptoms. Thus, instead of a time-consuming clinical evaluation, subjects can be given a test to determine the structure of their personality.

Two types of personality tests predominate in the evaluation of the criminal personality—projective techniques and personality inventories. Projective techniques require a subject to react to an ambiguous picture or shape by describing what it represents or by telling a story about it. The Rorschach Inkblot Test and the Thematic Apperception Test (TAT) are examples of two widely used projective tests. Such tests are given by clinicians trained to interpret responses and categorize them according to established behavioral patterns. However, such tests must be given individually by highly trained clinicians; and the analysis of responses is sometimes subject to individual interpretation.

The second frequently used method of psychological testing is the personality inventory. These tests require subjects to agree or disagree with groups of questions in a self-administered survey. The most widely used psychological test is the Minnesota Multiphasic Personality Inventory, commonly called the MMPI. Developed by R. Starke Hathaway and J. Charnley McKinley, the MMPI has subscales that purport to measure many different personality traits, including psychopathic deviation (Pd scale), schizophrenia (Sc), and hypomania (Ma).[97]

Elio Monachesi and R. Starke Hathaway pioneered the use of the MMPI to predict criminal behavior. They concluded that scores on some of the MMPI scales, especially the Pd scale, predicted delinquency. In one major effort, they administered the MMPI to a sample of ninth grade boys and girls in Minneapolis and found that Pd scores had a significant relationship to later delinquent involvement. Similar studies have been conducted by Hathaway, Monachesi, Lawrence Young, and William Kvaraceus and, more recently, Michael Hindelang, Joseph Weis, Spencer Rathus, and Larry Siegel.[98]

Despite the time and energy put into using MMPI and other scales to predict crime and delinquency, the results have proved inconclusive. Three surveys of the literature of personality testing—one by Karl Schuessler and Donald Cressey (covering the pre-1950 period), another by Gordon Waldo and Simon Dinitz (covering the period 1950–1965), and another, more recent survey by David Tennenbaum—found little evidence that personality traits could indeed predict criminal involvement.[99]

## A CRITIQUE OF PSYCHOLOGICAL THEORIES

Psychological theories are useful as explanations of the behavior of deeply disturbed, impulsive, or destructive people. However, they are limited as general explanations of criminality. For one thing, the phenomenon of crime and delinquency is so

## CLOSE-UP

# The Criminal Personality Revisited

*Despite the apparent failure of personality tests to show a linkage between personality traits and crime, a study by Samuel Yochelson, a psychiatrist, and Stanton Samenow, a psychologist, has allegedly identified the existence of a "criminal personality."*

After conducting in-depth interviews with 240 men under observation and treatment in St. Elizabeth's Hospital in Washington, D.C., Yochelson and Samenow conclude that a criminal personality exists. "It is not the environment that turns a man into a criminal" they argue, "it is a series of choices that he makes starting at a very early age."

Among the rather surprising conclusions the authors reach is that the criminal personality is imprinted at birth and is relatively unaffected by parental influences. In fact, they conclude that it is more likely that young criminals have a profound and negative effect on their families than that their families have a negative effect on them.

Further investigations led Yochelson and Samenow to draw the following conclusions about the criminal personality. People who have a criminal mind seek the excitement associated with law violation and scorn those living a "safe," socially productive life. They go out of their way to make friends with criminal groups and will do anything to win the approval of their criminal peers. In school, they try to exploit every situation for their own benefit. Later, at work, they exhibit the same abnormal, self-serving relationships.

Criminals are not specialists. By the time they are apprehended, they have committed hundreds of offenses of every type—property, assault, sex—but have not been arrested.

Most importantly, Yochelson and Samenow believe they have uncovered criminal thinking patterns strongly related to antisocial behavior.

The criminal lives in a world where there is no loyalty or trust, even in relation to others like him. Untrustworthy himself, he demands that others trust him. If he happens to earn others' trust, he exploits it. He depends on others but does not see his own dependence. To him, this exhibits weakness and places him in jeopardy. He claims he can live without interdependence but demands that others provide him with whatever he wants. The criminal does not know how to get along with responsible people from day to day; he generally occupies the extremes of total withdrawal or inappropriate intimacy. He is intolerant of others' shortcomings but reacts angrily when anyone finds fault with him. Instead of friendships, the criminal seeks avenues of triumph. People are to be used, conquered, controlled like pawns, exploited, and then discarded when they can no longer serve a purpose useful to him. Only rarely does the

widespread that to claim that all criminals are psychologically disturbed is to make that claim against a vast majority of people.

**Individual-Oriented Theory and Social Policy**

Individual-oriented theories have profoundly influenced social policy. Since the 1920s it has become commonplace to offer psychological treatment to offenders before, during, and after a criminal conviction. For example, beginning in the 1970s, pretrial programs have sought to divert offenders into nonpunitive rehabilitative programs designed to treat rather than punish them. Based on some type of counseling regime, diversion programs are commonly used with first offenders, nonviolent offenders, and so on.

At the trial stage, judges commonly order psychological profiles of convicted offenders for planning a treatment program. Should they be kept in the community? Do they need a more secure confinement to deal with their problems?

If correctional confinement is called for, inmates are commonly evaluated at a **classification center** in order to measure their personality traits or disorders. Correctional facilities almost universally require inmates to partake in some form of psychological therapy: group therapy, individual analysis, transactional analysis, and so on. Parole decisions may be influenced by the prison psychologist's evaluation of the offender's adjustment.



criminal genuinely "like" another person. His liking is based on someone's agreeing with him, building him up, assisting him in his plans, or at least not interfering with him. He also "likes" someone he can exploit. His very characteristics preclude his genuinely loving anyone. He regards kindness as weakness. Although he expresses fragments of sentimentality, the criminal cold-bloodedly uses the very people he professes to love.

Most of all, the criminal fears being put down by other people. A putdown occurs when someone fails to gratify his every desire or fulfill his every expectation. Any inconvenience is regarded as a personal affront. What a noncriminal habitually shrugs off reduces the power-thrusting, controlling criminal to a zero. The zero state, which is far more encompassing than the noncriminal's inferiority feelings, reflects the criminal's extremes in thinking and his misconception of himself and the outside world. He is either a colossus or a nothing. He regards himself as a zero when the world does not accord him the status that he thinks he deserves and things are not going according to plan. On such occasions, the criminal believes that everyone looks on him as a nothing and that this state is permanent. The seeming finality and futility of such a state are intolerable to him, and he usually responds with criminal acts, as well as with anger and with determination to reassert his status as "somebody" rather than continue to be (by his definition) a "nobody." Life for the criminal is a series of anger reactions to surmount his fear of being a nothing.

The antidote to the zero state is not constructive activity but a cutoff of fear, an angry reaction, and a search for excitement (crime). Anger is a basic component of the criminal's personality; it is pervasive, although not always apparent to others.

These therapists suggest that law violators, to be rehabilitated, must be taught to give up their amoral way of life and to operate on a new, moral basis. They see criminals as having three choices: continue in crime, commit suicide, or change totally to a legitimate lifestyle. Yochelson and Samenow suggest that criminals can learn to change by first developing self-insight and then learning to give up their criminal ideas and thought patterns.

Yochelson and Samenow's work is highly controversial, since it not only is critical of all other psychological and sociological theories but also suggests that criminals are inherently different from noncriminals.

### DISCUSSION QUESTIONS

1. Could criminals actually have different personalities than noncriminals?
2. How would Yochelson and Samenow explain the difference between a heroin user, a rapist, and an embezzler?

SOURCE: Samuel Yochelson and Stanton Samenow, *The Criminal Personality* vol. 1 (New York: Jason Aronson, 1977). Quotes from vol. I; pp. 119, 131.

Biologically oriented therapy is just now being used in the criminal justice system. Programs have altered diet, changed lighting, compensated for learning disabilities, treated allergies, and so on. Results of these experiments have been mixed.

In sum, for most of the twentieth century the criminal justice system has used a **medical model,** or rehabilitation philosophy, in dealing with law violators. The theory has two prongs: First, primary prevention programs seek to relieve personal problems before they manifest themselves as crime. Thousands of family therapy organizations, substance abuse clinics, mental health associations, and so on are operating around the United States. Referrals to these are made by teachers, employers, courts, welfare agencies, etc. It is assumed that if a person's problems can be treated before they become overwhelming, some future crimes will be prevented.

Secondary prevention programs provide aid and counseling to youths and adults after they have violated the law. Attendance in such programs may be a mandatory requirement of a probation order, part of a diversionary sentence, or as aftercare at the tail end of a prison sentence.

Beyond these efforts, the law recognizes the psychological aspects of crime when it permits the insanity plea as an excuse for criminal liability or when it permits trial delay because of mental incompetency.

*177*

This medical model is now under attack. The alleged failure of rehabilitation programs, heralded by research efforts indicating that "nothing seems to work," caused many criminologists and policy makers to turn to the more conservative classical measures described in chapter 5. Today the rehabilitation model is at a crossroads, challenged on one side by critics who believe punishment and not treatment is the proper response to criminality and on the other by criminologists who charge that rehabilitation efforts are self-defeating, since they label and stigmatize clients as sick or crazy (see chapter 7).

Despite the widely heralded death of the treatment model, psychological and biological efforts continue to flourish. It is ironic that although the evidence is inconclusive that crime is a function of individual maladaptation, the justice system continues to rely on individual therapy as a major form of crime prevention.

**Summary**

The earliest positivist criminologists were biologists. Led by Cesare Lombroso, these early researchers believed some people manifested primitive traits that made them born criminals. Today, their research is debunked because of poor methodology, testing, and logic.

Other pioneering biological research portrayed criminality as an inherited trait passed from one generation of criminals to another. Still another early direction of biocriminology focused on the body build of criminals. Otto Kretschmer and later William Sheldon along with Sheldon and Eleanor Glueck believed that the human body could be classified on the basis of size and musculature. Criminals and delinquents were believed to have well-developed muscles and an athletic appearance, a type known as mesomorphic.

Biological views fell out of favor in the early twentieth century. In the 1970s, spurred by the publication of E. O. Wilson's *Sociobiology*, several criminologists again turned to study of the biological basis of criminality. For the most part, the effort has focused on the cause of violent crime. Interest has centered on several areas: (1) biochemical factors such as diet, allergies, hormonal imbalances, and environmental contaminants such as lead; (2) neurophysiological factors such as brain disorders, EEG abnormalities, tumors, and head injuries; and (3) genetic factors such as the XYY chromosome and inherited traits. Biocriminology is in its infancy, and no definitive studies have been undertaken.

Psychological attempts to explain criminal behavior have their historical roots in the concept that all criminals are insane or mentally damaged. This position is no longer accepted. Today, there are four main psychological perspectives. The psychoanalytic view, the creation of Sigmund Freud, links aggressive behavior to personality conflicts developed in childhood. In the worst case, conflict leads to a severe behavior disorder called psychosis. According to some psychoanalysts, psychotics are aggressive, unstable people who can easily become involved in crime.

Cognitive psychology is concerned with human development and how people perceive the world. Criminality is viewed as a function of improper moral development. In contrast, learning theorists see criminality as a learned behavior. Children who are exposed to violence and see it rewarded may become violent as adults. Physiological psychologists link psychological traits with biological factors. One important area of study has been the psychopath, a person who lacks emotion and concern for others. Another issue is the relationship of IQ to criminality. This controversial issue has been resurrected once again with the publication of research studies purporting to show that criminals have lower IQs than noncriminals.

Psychologists have developed standardized tests with which to measure personality traits. One avenue of research has been to determine whether criminals and noncriminals manifest any differences in their responses to test items. Three major reviews of the literature have failed to find any direct link of criminality and personality.

**Notes**

1 Marvin Wolfgang, "Cesare Lombroso," in *Pioneers in Criminology*, ed. Hermann Mannheim (Montclair, N.J.: Patterson Smith, 1970), pp. 232–71.

2 See generally Cesare Lombroso, *Crime, Its Causes and Remedies* (Montclair, N.J.: Patterson Smith, 1968).

3 Gina Lombroso-Ferrero, *Criminal Man According to the Classification of Cesare Lombroso* (Montclair, N.J.: Patterson Smith, 1972), p. 100.

4 Ibid., p. 118.

5 Charles Goring, *The English Convict: A Statistical Study, 1913* (Montclair, N.J.: Patterson Smith, 1972).

6 Edwin Driver, "Charles Buckman Goring," in *Pioneers in Criminology*, ed. Hermann Mannheim (Montclair, N.J.: Patterson Smith, 1970), p. 440.

7 Raffaele Garofalo, *Criminology*, trans. Robert Miller (Boston: Little, Brown, 1914), p. 92.

8 Enrico Ferri, *Criminal Sociology* (New York: D. Appleton, 1909).

9 Ernest Hooton, *The American Criminal* (Cambridge, Mass.: Harvard University Press, 1939), p. 309.

10 Richard Dugdale, *The Jukes* (New York: Putnam, 1910); Arthur Estabrook, *The Jukes in 1915* (Washington, D.C.: The Carnegie Institute of Washington, 1916). The studies in this section are described in Stephen Schafer, *Introduction to Criminology* (Reston, Va.: Reston Publishing, 1976), pp. 60–61.

11 Henry Herbert Goddard, *The Kallikak Family: A Study in the Heredity of Feeble-Mindedness* (New York: Macmillan, 1927).

12 Ernst Kretschmer, *Physique and Character*, trans. W. J. H. Spratt (London: Keegan, Paul, Trench, Trubner, 1925).

13 William Sheldon, *Varieties of Delinquent Youth* (New York: Harper & Bros., 1949).

14 Sheldon Glueck and Eleanor Glueck, *Of Delinquency and Crime* (Springfield, Ill.: Charles C. Thomas, 1974), p. 2.

15 B. R. McCandless, W. S. Persons, and A. Roberts, "Perceived Opportunity, Delinquency, Race and Body Build among Delinquent Youth," *Journal of Consulting and Clinical Psychology* 38 (1972):281.

16 Pierre van den Bergle, "Bringing Beast Back In: Toward a, Biosocial Theory of Aggression," *American Sociological Review* 39 (1974):779.

17 E. O. Wilson, *Sociobiology* (Cambridge, Mass.: Harvard University Press, 1975).

18 C. Ray Jeffrey, "Criminology as an Interdisciplinary Behavioral Science," *Criminology* 16 (1978):161–62.

19 Material in these subsections relies heavily on Leonard Hippchen, "Some Possible Biochemical Aspects of Criminal Behavior," *Journal of Behavioral Ecology* 2 (1981):1–6; Sarnoff Mednick and Jan Volavka, "Biology and Crime," in *Crime and Justice*, ed. Norval Morris and Michael Tonry (Chicago: University of Chicago Press, 1980), pp. 85–159; Saleem Shah and Loren Roth, "Biological and Psychophysiological Factors in Criminality," in *Handbook of Criminology*, ed. Daniel Glazer (Chicago: Rand McNally, 1974), pp. 125–40.

20 Leonard Hippchen, ed., *Ecologic-Biochemical Approaches to Treatment of Delinquents and Criminals* (New York: Von Nostrand Reinhold, 1978), p. 14.

21 Ibid.

22 J. Kershner and W. Hawke, "Megavitamins and Learning Disorders: A Controlled Double-blind Experiment," *Journal of Nutrition* 109 (1979):819–26.

23 Stephen Schoenthaler and Walter Doraz, "Types of Offenses Which Can Be Reduced in an Institutional Setting Using Nutritional Intervention," *International Journal of Biosocial Research* 4 (1983):74–84; and idem, "Diet and Crime," *International Journal of Biosocial Research* 4 (1983):29–39; see also A.G. Schauss, "Differential Outcomes among Probationers Comparing Orthomolecular Approaches to Conventional Casework Counseling," (Paper presented at the Annual Meeting of the American Society of Criminology, Dallas, Texas, 9 November 1978); A. Schauss and C. Simonsen, "A Critical Analysis of the Diets of Chronic Juvenile Offenders, Part I," *Journal of Orthomolecular Psychiatry* 8 (1979):149–57. See also A. Schauss, J. Bland, and C. Simonsen, "A Critical Analysis of the Diets of Chronic Juvenile Offenders, Part II," *Journal of Orthomolecular Psychiatry* 8 (1979):222–26; A. Hoffer, "Children with Learning and Behavioral Disorders," *Journal of Orthomolecular Psychiatry* 5 (1976):229.

24 D. Hill and W. Sargent, "A Case of Matricide," *Lancet* 244 (1943):526–27.

25 E. Podolsky, "The Chemistry of Murder," *Pakistan Medical Journal* 15 (1964):9–14.

26 J. A. Yaryura-Tobias and F. Neziroglu, "Violent Behavior Brain Dysrhythmia and Glucose Dysfunction, a New Syndrome," *Journal of Orthopsychiatry* 4 (1975):182–88.

27 L. E. Kreuz and R. M. Rose, "Assessment of Aggressive Behavior and Plasma Testosterone in a Young Criminal Population," *Psychosomatic Medicine* 34 (1972):321–32.

28 Richard Rada, "Plasma Androgens in Violent and Non-Violent Sex Offenders," *Bulletin of the American Academy of Psychiatry and the Law* 11 (1983):149–58; R. T. Rada, D. R. Laws, and R. Kellner, "Plasma Testosterone Levels in the Rapist," *Psychosomatic Medicine* 38 (1976):257–68.

29 Sarnoff Mednick and Jan Volavka, "Biology and Crime."

30 J. Money, "Influence of Hormones on Psychosexual Differentiation," *Medical Aspects of Human Sexuality* 2 (1968):32–42.

31 H. E. Amos and J. J. P. Drake, "Problems Posed by Food Additives," *Journal of Human Nutrition* 30 (1976):165.

32 Ray Wunderlich, "Neuroallergy as a Contributing Factor to Social Misfits: Diagnosis and Treatment," in *Ecologic-Biochemical Approaches to Treatment of Delinquents and Criminals*, ed. Leonard Hippchen (New York: Von Nostrand Reinhold, 1978), pp. 229–53.

33 A. R. Mawson and K. J. Jacobs, "Corn Consumption, Tryptophan, and Cross-National Homicide Rates," *Journal of Orthomolecular Psychiatry* 7 (1978):227–30.

34 A. Schauss, *Diet, Crime and Delinquency* (Berkeley, Calif.: Parker House, 1980).

35 C. Hawley and R. E. Buckley, "Food Dyes and Hyperkinetic Children," *Academy Therapy* 10 (1974):27–32.

36 Oliver David, Stanley Hoffman, Jeffrey Sverd, Julian Clark, and Kytja Voeller, "Lead and Hyperactivity. Behavior Response to Chelation: A Pilot Study," *American Journal of Psychiatry* 133 (1976):1155–58.

37 John Ott, "The Effects of Light and Radiation on Human Health and Behavior," in *Ecologic-Biochemical Approaches to Treatment of Delinquents and Criminals*, ed. Leonard Hippchen (New York: Von Nostrand Reinhold, 1978), pp. 105–83. See also A. Kreuger and S. Sigel, "Ions in the Air," *Human Nature*, July (1978):46–47; Harry Wohlfarth, "The Effect of Color Psychodynamic Environmental Modification on Disciplinary Incidents in Elementary Schools Over One School Year: A Controlled Study," *International Journal of Biosocial Research* 6 (1984):44–53.

38 R. D. Robin, R. M. Sarles, T. J. Kenney, B. J. Reynolds, and F. P. Heald, "Adolescents Who Attempt Suicide," *Journal of Pediatrics* 90 (1977):636–38.

39 R. R. Monroe, *Brain Dysfunction in Aggressive Criminals* (Lexington, Mass.: D. C. Heath, 1978).

40 L. T. Yeudall, *Childhood Experiences as Causes of Criminal Behavior* (Senate of Canada, Issue no. 1, Thirteenth Parliament, Ottawa, Canada, 1977).

41 C. Murray, *The Link between Learning Disabilities and Juvenile Delinquency* (Washington, D. C.: Government Printing Office, 1976), p. 65. See also B. Claire McCullough, Barbara Zaremba, and William Rich, "The Role of the Juvenile Justice System in the

Link between Learning Disabilities and Delinquency," *State Court Journal* 3 (1979):45; Hill and Sargent, "A Case of Matricide."

42 D. Williams, "Neural Factors Related to Habitual Aggression—Consideration of Differences between Habitual Aggressives and Others Who Have Committed Crimes of Violence," *Brain* 92 (1969):503–20.

43 R. S. Aind and T. Yamamoto, "Behavior Disorders of Childhood," *Electroencephalography and Clinical Neurophysiology* 21 (1966):148–56.

44 Z. A. Zayed, S. A. Lewis, and R. P. Britain, "An Encephalographic and Psychiatric Study of 32 Insane Murderers," *British Journal of Psychiatry* 115 (1969):1115–24.

45 K. E. Moyer, *The Psychobiology of Aggression* (New York: Harper & Row, 1976).

46 Ibid., pp. 24–25.

47 H. D. Kletschka, "Violent Behavior Associated with Brain Tumors," *Minnesota Medicine* 49 (1966):1853–55.

48 R. Johnson, *Aggression in Man and Animals* (Philadelphia: Saunders, 1972), p. 79.

49 C. E. Lyght, ed., *The Merck Manual of Diagnosis and Therapy* (West Point, Pa.: Merck, 1966).

50 This section relies heavily on Shah and Roth, "Biological and Psychophysiological Factors in Criminality," pp. 134–40; Lee Ellis, "Genetics and Criminal Behavior," *Criminology* 20 (1982):43–67.

51 A. A. Sandberg, G. F. Koepf, T. Ishiara, T. S. Hauschka, "An XYY Human Male," *Lancet* 262 (1961):488–89.

52 Shah and Roth, "Biological and Psychophysiological Factors in Criminology," p. 135.

53 T. R. Sarbin and L. E. Miller, "Demonism Revisited: The XYY Chromosome Anomaly," *Issues in Criminology* 5 (1970):195–207.

54 Shah and Roth, "Biological and Psychophysiological Factors in Criminality," p. 137.

55 Mednick and Volavka, "Biology and Crime," p. 93.

56 Ibid., p. 94.

57 Ibid., p. 95.

58 See Sarnoff A. Mednick and Karl O. Christiansen, *Biosocial Bases in Criminal Behavior* (New York: Gardner Press, 1977).

59 David Rowe and D. Wayne Osgood, "Heredity and Sociological Theories of Delinquency: A Reconsideration," *American Sociological Review* 49 (1984):526–40.

60 Mednick and Volavka, "Biology and Crime," p. 97.

61 Barry Hutchings and Sarnoff A. Mednick, "Criminality in Adoptees and Their Adoptive and Biological Parents: A Pilot Study," in *Biosocial Bases in Criminal Behavior*, ed. S. A. Mednick and K. O. Christiansen (New York: Gardner Press, 1977).

62 Sarnoff Mednick, William Gabrielli, and Barry Hutchings, "Genetic Influences in Criminal Behavior: Evidence from an Adoption Cohort," in *Perspective Studies of Crime and Delinquency*, Katherine Teilmann Van Dusen and Sarnoff Mednick, eds. (Boston: Kluver-Nijhoff, 1983), pp. 39–57; K.S Van Dusen, S. Mednick, S. Gabrielli, and B. Hutchings, "Social Class and Crime in An Adoption Cohort," *Journal of Criminal Law and Criminology* (1983).

63 See Peter Scott, "Henry Maudsley," in *Pioneers in Criminology*, ed. Hermann Mannheim (Montclair, N.J.: Patterson Smith, 1970), p. 212.

64 See generally Spencer Rathus, *Psychology* (New York: Holt, Rinehart and Winston, 1984).

65 See generally Donn Byrne and Kathryn Kelly, *An Introduction to Personality* (Englewood Cliffs, N.J.: Prentice-Hall, 1981).

66 This section adapted from Rathus, *Psychology*. pp. 412–20.

67 Sigmund Freud, "The Ego and the Id," in *Complete Psychological Works of Sigmund Freud*. vol. 19 (London: Hogarth, 1948), p. 52.

68 August Aichorn, *Wayward Youth* (New York: Viking Press, 1935).

69 David Abrahamsen, *Crime and the Human Mind* (New York: Columbia University Press, 1944), p. 137; see generally, Fritz Redl and Hans Toch, "The Psychoanalytic Per-

spective," in *Psychology of Crime and Criminal Justice*, ed. Hans Toch (New York: Holt, Rinehart and Winston, 1979), pp. 193–95.

70 Seymour Halleck, *Psychiatry and the Dilemmas of Crime* (Berkeley, Calif.: University of California Press, 1971).

71 James Sorrells, "Kids Who Kill," *Crime and Delinquency* 23 (1977):312–20.

72 Richard Rosner, "Adolescents Accused of Murder and Manslaughter: a Five Year Descriptive Study," *Bulletin of The American Academy of Psychiatry and The Law* 7 (1979):342–51.

73 See generally Jean Piaget, *The Moral Judgement of the Child* (London: Keagan Paul, 1932).

74 Lawrence Kohlberg, *Stages in the Development of Moral Thought and Action* (New York: Holt, Rinehart and Winston, 1969).

75 L. Kohlberg, K. Kauffman, P. Scharf, and J. Hickey, *The Just Community Approach in Corrections: A Manual* (Niantic, Conn.: Connecticut Department of Corrections, 1973).

76 This discussion is based on three works by Albert Bandura: *Aggression: A Social Learning Analysis* (Englewood Cliffs, N.J.: Prentice-Hall, 1973); *Social Learning Theory* (Englewood Cliffs, N.J.: Prentice-Hall, 1977); "The Social Learning Perspective: Mechanisms of Aggression," in *Psychology of Crime and Criminal Justice*, ed. H. Toch (New York: Holt, Rinehart and Winston, 1979), pp. 198–236.

77 David Phillips, "The Impact of Mass Media Violence on U.S. Homicides," *American Sociological Review* 48 (1983):560–68.

78 See generally Albert Rabin, "The Antisocial Personality—Psychopathy and Sociopathy," in *The Psychology of Crime and Criminal Justice*, ed. Hans Toch (New York: Holt, Rinehart and Winston, 1979), pp. 236–51.

79 Robert Hare and Jeffery Jutai, "Criminal History of the Male Psychopath: Some Preliminary Data," in Tielmann, Van Dusen, and Mednick, eds., *Perspective Studies of Crime and Delinquency*, pp. 225–36.

80 Seymour Halleck, *Psychiatry and the Dilemmas of Crime* (New York: Harper & Row, 1967), pp. 99–115.

81 See generally Mednick and Volavka, "Biology and Crime," pp. 105–23.

82 Rathus, *Psychology*, p. 545.

83 Henry Goddard, *Efficiency and Levels of Intelligence* (Princeton, N.J.: Princeton University Press, 1920).

84 Edwin Sutherland, "Mental Deficiency and Crime," in *Social Attitudes*, ed. Kimball Young (New York: Henry Holt, 1931), chap. 15.

85 William Healy and Augusta Bronner, *Delinquency and Criminals: Their Making and Unmaking* (New York: MacMillan, 1926).

86 See C. Burt, "The Inheritance of Mental Ability," *American Psychologist* 13 (1958): 1–15.

87 John Slawson, *The Delinquent Boys* (Boston: Budget Press, 1926).

88 Kenneth Eels, et al., *Intelligence and Cultural Differences* (Chicago: University of Chicago Press, 1951), p. 181.

89 Robert Rosenthal and Lenore Jacobsen, *Pygmalion in the Classroom* (New York: Holt, 1968).

90 See generally Arthur Jensen, *Bias in Mental Testing* (New York: Free Press, 1979); see also Arthur Jensen, "How Much Can We Boost IQ and Scholastic Achievement?" *Harvard Educational Review* 39 (1969):1–123.

91 Sandra Scarr and Richard Weinberg, "I.Q. Test Performance of Black Children Adopted by White Families," *American Psychologist* 31 (1976):726–39.

92 Sandra Scarr and Richard Weinberg, "The Minnesota Adoption Studies: Genetic Differences and Malleability," *Child Development* 54 (1983):260–67.

93 For an opposing view, see Joseph Horn, "The Texas Adoption Project: Adopted Children and Their Intellectual Resemblance to Biological and Adoptive Parents," *Child Development* 54 (1983):268–75.

Case 1:06-cv-01657-RCL    Document 1-5    Filed 09/26/2006    Page 12 of 13

Holt,

sity of

ir De-
*aw* 7

Paul,

York:

*ach in*
973).
*rning*
ingle-
nisms
York:

*erican*

:iopa-
Holt,

elim-
*Crime*

Row,

ersity

nball

*l Un-*

958):

icago

Holt,

i; see
*nt?"*

ipted

Dif-

ldren
*)evel-*

94  Travis Hirschi and Michael Hindelang, "Intelligence and Delinquency: A Revisionist Review," *American Sociological Review* 42 (1977):471–586.

95  Terrie Moffitt, William Gabrielli, Sarnoff Mednick, and Fini Schulsinger, "Socioeconomic Status, IQ, and Delinquency," *Journal of Abnormal Psychology* 90 (1981): 152–56.

96  Ibid., p. 155. For a similar finding, see L. Hubble and M. Groff, "Magnitude and Direction of WISC-R Verbal Performance IQ Discrepancies Among Adjudicated Male Delinquents," *Journal of Youth and Adolescence* 10 (1981):179–83.

97  See generally R. Starke Hathaway and Elio Monachesi, *Analyzing and Predicting Juvenile Delinquency with the MMPI* (Minneapolis: University of Minnesota Press, 1953).

98  R. Starke Hathaway, Elio Monachesi, and Lawrence Young, "Delinquency Rates and Personality," *Journal of Criminal Law, Criminology and Police Science* 51 (1960):443–60; Michael Hindelang and Joseph Weis, "Personality and Self-Reported Delinquency: An Application of Cluster Analysis," *Criminology* 10 (1972):268; Spencer Rathus and Larry Siegel, "Crime and Personality Revisited," *Criminology* 18 (1980):245–51.

99  Karl Schuessler and Donald Cressey, "Personality Characteristics of Criminals," *American Journal of Sociology* 55 (1950):476–84; Gordon Waldo and Simon Dinitz, "Personality Attributes of the Criminal: An Analysis of Research Studies 1950–1965," *Journal of Research in Crime and Delinquency* 4 (1967):185–201; David Tennenbaum, "Research Studies of Personality and Criminality," *Journal of Criminal Justice* 5 (1977):1–19.

**End of Complaint Request:**

Pursuant to 28 U.S.C. Sec. 1746, I declare under penalty of perjury, under the laws

of the United States, that the foregoing statements and Exhibits that will serve as evidence

are true and correct for the record, I signed these statements before a certified legal notary

witnessing me (the Plaintiff) signing to make any but all statements as truthful, legal and

binding under oath making this submission and others statements, responses or submission

are sworn Affidavit under oath this date forth for the record.


Respectfully Submitted,

Samuel Clemmons
Plaintiff, *Pro Se*

**Attachment:** Chapter 6, Biological and Psychological Theories of Crime Causation

_____          _____
Notary Witness Signature                          Date and Notary Seal

PHYLLIS BILLINGSLY
NOTARY PUBLIC
Paulding County
State of Georgia
My Comm. Expires Mar. 9, 2009

CLEMMONS' ESTATE v. STATE OF GEORGIA, et al (REF: CONSTITUTIONAL RIGHTS VIOLATIONS

184

**CLEMMONS' ESTATE**

**V.**

**STATE OF GEORIGA, et al**                                    **(3 Pages Total)**

### BRIEF ACCORDING TO SECTION VI (CAUSE OF ACTION) LISTED BELOW

**American Law Reports ALR Federal**
**The ALR databases are made current by the weekly addition of relevant new**
**cases**

➢ **Giving false information to federal department or agency as violation of 18 U.S.C.A. § 1001, making it criminal offense to make false statements in any matter under jurisdiction of department or agency of United States**

Beth Bates Holliday, J.D.

The broad range of conduct potentially proscribed by 18 U.S.C.A. § 1001, coupled with Congress' limited guidance as to specific behavior within the statute's scope, has provided ample opportunity for arguments that a particular defendant's act or failure to act was not prohibited by § 1001 or, as in United States v Salas-Camacho (1988, CA9 Cal) 859 F2d 788, 111 ALR Fed 779, that the proscribed conduct should be considered a single act of falsification supporting only a single conviction, rather than separate falsifications supporting multiple § 1001 convictions. Cases determining whether the acts or nonfeasance charged violated § 1001 have been collected and analyzed in this annotation.

TABLE OF CONTENTS

Article Outline
Index
Statutory Text
Table of Cases, Laws, and Rules
Research References

ARTICLE OUTLINE

§ 1[a] Introduction--Scope

§ 1[b] Introduction--Related annotations

§ 2. Background and summary

§ 3[a] Statements relating to criminal matters other than criminal tax evasion--commission of offense-- Held to violate 18 U.S.C.A. § 1001

➢ **§ 3[b] Statements relating to criminal matters other than criminal tax evasion--commission of offense--Held not to violate 18 U.S.C.A. § 1001**

➢ **§ 4[a] Identity of person involved in criminal proceeding--Held to violate 18 U.S.C.A. § 1001**

➢ **§ 4[b] Identity of person involved in criminal proceeding--Held not to violate 18 U.S.C.A. § 1001**

§   5[a] Resolution of pretrial procedural issue--Held to violate 18 U.S.C.A. §  1001

§   5[b] Resolution of pretrial procedural issue--Held not to violate 18 U.S.C.A. §  1001

➢   **§   6[a] Prior criminal record--Held to violate 18 U.S.C.A. §  1001**

➢   **§   6[b] Prior criminal record--Held not to violate 18 U.S.C.A. §  1001**

§   7[a] Bail--Held to violate 18 U.S.C.A. §  1001

§   7[b] Bail--Held not to violate 18 U.S.C.A. §  1001

§   8. Sentencing

§   9[a] Statements relating to civil proceedings--Held to violate 18 U.S.C.A. §  1001

§   9[b] Statements relating to civil proceedings--Held not to violate 18 U.S.C.A. §  1001

§   10[a] Statements relating to federal income tax--Held to violate 18 U.S.C.A. §  1001

§   10[b] Statements relating to federal income tax--Held not to violate 18 U.S.C.A. §  1001

§   11[a] Statements relating to government contracts--Held to violate 18 U.S.C.A. §  1001

§   11[b] Statements relating to government contracts--Held not to violate 18 U.S.C.A. §  1001

§   12. Statements relating to individual's employment with or licensing by Federal Government or employment with employer receiving federal funds-- qualifications

§   13[a] Prior criminal record or criminal activity--Held to violate 18 U.S.C.A. §  1001

§   13[b] Prior criminal record or criminal activity--Held not to violate 18 U.S.C.A. §  1001

§   14. Conflict between employee's and government's interests

➢   **§   15. Employee's misuse of position**

§   16. Compensation or benefits

§   17[a] Statements relating to federal grant or loan, generally--Held to violate 18 U.S.C.A. §  1001

§   17[b] Statements relating to federal grant or loan, generally--Held not to violate 18 U.S.C.A. §  1001

§   18[a] Statements relating to payment under federal entitlement or subsidy program--Held to violate 18 U.S.C.A. §  1001

§   18[b] Statements relating to payment under federal entitlement or subsidy program--Held not to violate 18 U.S.C.A. §  1001

§   19[a] Statements relating to federally insured loans--Held to violate 18 U.S.C.A. §  1001

§   19[b] Statements relating to federally insured loans--Held not to violate 18 U.S.C.A. §  1001

§   20[a] Statements relating to activities of financial institutions--filing currency transaction reports (CTRs)--Held to violate 18 U.S.C.A. §  1001

§    20[b] Statements relating to activities of financial institutions--filing currency transaction reports (CTRs)--Held not to violate 18 U.S.C.A. § 1001

➢  **§  21. Other activities**

§  22[a] Statements relating to stock or brokerage agreements--Held to violate 18 U.S.C.A. § 1001

§  22[b] Statements relating to stock or brokerage agreements--Held not to violate 18 U.S.C.A. § 1001

§  23. Statements relating to patents

§  23.5. Statements relating to copyright

§    24[a] Statements relating to identification of individual, other than individual appearing in criminal proceeding--Held to violate 18 U.S.C.A. § 1001

§    24[b] Statements relating to identification of individual, other than individual appearing in criminal proceeding--Held not to violate 18 U.S.C.A. § 1001

§  25[a] Statements relating to military matters or national defense--Held to violate 18 U.S.C.A. § 1001

§    25[b] Statements relating to military matters or national defense--Held not to violate 18 U.S.C.A. § 1001

§  26. Statements relating to purchase of surplus government property

§  27. Statements relating to quality, usage, or possession of federally regulated consumer goods

§  28. Statements relating to interstate shipment of goods

§    29[a] Statements relating to goods being brought into, or going out of, country--Held to violate 18 U.S.C.A. § 1001

§    29[b] Statements relating to goods being brought into, or going out of, country--Held not to violate 18 U.S.C.A. § 1001

§    30[a] Statements relating to amount of money individual has when crossing United States border--Held to violate 18 U.S.C.A. § 1001

§    30[b] Statements relating to amount of money individual has when crossing United States border--Held not to violate 18 U.S.C.A. § 1001

§  31[a] Statements relating to immigration and naturalization matters--Held to violate 18 U.S.C.A. § 1001

§  31[b] Statements relating to immigration and naturalization matters--Held not to violate 18 U.S.C.A. § 1001

§  32[a] Statements relating to assets held outside United States--Held to violate 18 U.S.C.A. § 1001

§  32[b] Statements relating to assets held outside United States--Held not to violate 18 U.S.C.A. § 1001

§  33. Statements relating to compliance with environmental protection regulations

➢  **§  34. Other statements**

➢  **§  35. Constitutionality**